UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

JOSE L. ECHAVARRIA,

                Petitioner,

   v.

RENEE BAKER, *et al.*,

            Respondents.

Case No. 3:98-cv-00202-MMD-VPC

ORDER

## I.     INTRODUCTION

This action is a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Jose L. Echavarria, a Nevada prisoner convicted of first degree murder and other crimes, and sentenced to death for the murder conviction and to prison sentences for the other felony convictions. The case is before the Court for resolution of the merits of the claims remaining in Echavarria's second amended petition for writ of habeas corpus, and with respect to a motion made by Echavarria requesting an evidentiary hearing. The Court finds that an evidentiary hearing is not warranted, and denies Echavarria's motion for an evidentiary hearing. The Court grants Echavarria habeas corpus relief with respect to one of his claims (Claim 4), and orders the State to retry Echavarria within a specified time or release him from custody. The Court directs the Clerk of the Court to enter judgment accordingly, but orders the judgment stayed pending appellate and certiorari review. The Court denies Echavarria a certificate of appealability regarding his claims on which relief is denied.

## II.     BACKGROUND FACTS AND PROCEDURAL HISTORY

The following is the statement of facts and procedural history set forth by the Nevada Supreme Court in its 1992 opinion on the direct appeal of Echavarria and his co-defendant, Carlos Alfredo Gurry:

> On the morning of June 25, 1990, Jose Lorrente Echavarria, disguised as a woman and wearing a gauze pad on his cheek and a cast or sling on his arm, entered a Las Vegas branch of the Security Pacific Bank with the intention of robbing it. Echavarria previously had surveyed the bank and determined that no security guards were employed there. When Echavarria approached a bank teller and eventually pointed a gun at her, the teller screamed and jumped back from the counter, causing Echavarria to abandon his holdup attempt and start walking towards the exit door of the bank.

> FBI Special Agent John Bailey, who happened to be at the bank on Bureau business at the time of the incident, inquired about the commotion. Upon learning that Echavarria had pulled a gun on a bank teller, Bailey turned to follow Echavarria, pulled out his gun, and yelled something akin to "halt, this is the FBI." Echavarria turned, glanced at Bailey, and continued to walk towards the exit. Bailey then fired a shot that shattered the bank's glass front door. Echavarria stopped. Bailey grabbed the gunman, held him against the wall, and ordered him to drop his gun, which Echavarria eventually did.

> Acting swiftly, Agent Bailey frisked Echavarria, requested that someone call the FBI office, and asked a bank employee to retrieve his handcuffs from his car. Bailey seated Echavarria in a chair while he waited for the handcuffs. The bank employee returned with the cuffs, but before Bailey could shackle Echavarria, he jumped out of the chair and collided with Bailey. During the ensuing scuffle, Bailey fell to the ground and Echavarria, retrieving his own gun, fired several shots at the downed agent. Echavarria then ran from the bank. Bailey was transported to a hospital, where he succumbed to three gunshot wounds.

> The trial evidence supported the State's theory that after exiting the bank, Echavarria ran to his blue Firebird where the getaway driver, Carlos Alfredo Gurry, was waiting and the two sped away. A police officer who arrived at the crime scene shortly after Echavarria had fled discovered a motorcycle in the handicap parking space outside the bank. An investigation of the vehicle identification number on the motorcycle revealed Echavarria as the owner. A DMV check disclosed that the license plate attached to the motorcycle belonged to another vehicle. The rightful owner of the license plate identified Gurry as the person he had seen lurking around his motorcycle on two mornings shortly before the bank incident. Testing revealed Gurry's fingerprints on the stolen plate.

> Information from a wallet which Bailey had removed from Echavarria during the frisk quickly led investigators to the apartment shared by Echavarria and Gurry. The license plate belonging to Echavarria's motorcycle and a screwdriver were found on the walkway in

2

front of the apartment. Inside the apartment, clothes were strewn about the living room floor. In a dumpster outside the apartment police found a Security Pacific Bank Visa credit card application with both Echavarria's and Gurry's fingerprints on it, and a business card with C. Williams Costume Shop written on the back. When questioned, clerks at the costume shop remembered two Hispanic men who came into the store a few days before the attempted robbery and looked at afro wigs and arm casts, although they could not remember if the men purchased anything.

Gurry was arrested when he returned to his apartment the afternoon of the incident. Initially, Gurry stated that he had been at a friend's house working on a car since 9:00 a.m. Later, Gurry told the FBI that he was scared and had lied about his first story. Gurry stated that he had actually borrowed Echavarria's car on the morning of June 25, 1990, to take care of an immigration problem and some errands, and that he thereafter spent the remainder of the morning at the apartment. Gurry reported that Echavarria, looking desperate, came into the apartment about noon, changed clothes and left in a hurry. Gurry said that Echavarria's behavior frightened him, so he called a friend to pick him up. Gurry allegedly stayed about half an hour at the friend's house, then returned home.

Meanwhile, Echavarria headed south in his blue Firebird, arriving at the home of a former girlfriend in Juarez, Mexico, in the early morning of June 26, 1990. Echavarria convinced the former girlfriend, Maria Garcia, to give him six hundred dollars before leaving. Echavarria next contacted Maria's brother, Jorge Garcia, for help. Jorge bought an airline ticket for Echavarria and took him to the airport. At Echavarria's request, Jorge also buried two guns and abandoned the blue Firebird along the highway. [Footnote: The guns were later recovered by the Mexican authorities and turned over to the FBI. One of the guns fired the bullets which killed Agent Bailey. The other had been purchased by Gurry from a co-worker in late May, 1990. The Firebird was also recovered and searched, revealing the fingerprints of Echavarria and Gurry, and fragments of glass consistent with the glass in the bank door.]

The Juarez police arrested Echavarria at the airport at about 8:30 p.m. on June 26, 1990. The next morning, Echavarria signed a written statement confessing to the murder of Agent Bailey. Echavarria was turned over to the FBI after his confession, and subsequently returned to the United States.

Echavarria and Gurry were each indicted on five counts: first-degree murder with the use of a deadly weapon, burglary, attempted robbery, escape and conspiracy. The State had to conduct a second grand jury to indict Gurry because the district court found that the evidence against Gurry in the first grand jury was insufficient and the prosecutor had misled the grand jury and failed to present exculpatory evidence.

Before trial, Echavarria moved to suppress his Juarez confession on the grounds that he had confessed after being subjected to physical torture and abuse while in the custody of the Mexican authorities. After a two-day evidentiary hearing, the motion was denied.

3

1
2
Trial commenced on March 15, 1991, and the guilt phase concluded with jury verdicts of guilty on all counts against Echavarria. Gurry was found guilty of all counts except the escape charge, which the district court had dismissed for lack of evidence.

3
4
5
6
7
After the penalty phase of the trial, the jury found three aggravating circumstances relating to the murder committed by Echavarria and sentenced him to death. The jury found four mitigating circumstances in favor of Gurry and sentenced him to life in prison with the possibility of parole. [Footnote: Gurry received a second life term as a deadly weapon enhancement.] The district court also sentenced each appellant to additional prison time for the other felonies. Appellants' motion for a new trial was denied.

8
9
*Echavarria v. State*, 108 Nev. 734, 737-39, 839 P.2d 589, 591-93 (1992) (copy in record at Exh. 112).[1]

10
11
12
13
The Nevada Supreme Court affirmed Echavarria's conviction and sentence. *Id.* The United States Supreme Court denied certiorari on May 17, 1993. *Echavarria v. Nevada*, 508 U.S. 914 (1993). The Nevada Supreme Court ordered its remittitur issued on January 25, 1994. Exh. 116.

14
15
16
17
Echavarria filed his first state-court habeas corpus petition on July 28, 1995. Exh. 119. That petition was denied by the state district court on November 7, 1995. Exh. 122. Echavarria appealed. *See* Exhs. 127, 129. The appeal was dismissed on December 20, 1996. Exh. 130. Rehearing was denied on December 17, 1997. Exhibit 132.

18
19
20
21
22
Echavarria initiated this federal habeas corpus action on April 17, 1998, by filing a *pro se* habeas petition (dkt. no. 1). On May 1, 1998, the Court appointed counsel to represent Echavarria. (Dkt. nos. 3, 8, 9.) Extensive discovery proceedings ensued. (*See*, *e.g.*, dkt. nos. 17, 47, 49, 68.) On October 16, 2006, Echavarria filed a first amended habeas petition (dkt. nos. 107 and 108).

23
///

24

25
26
27
28
[1]In this order, exhibits identified only by exhibit number and without further designation ("Exh. ___") are the exhibits filed by the respondents on March 1 and 16, 1999, and found in the Court's electronic filing system at dkt. nos. 23 and 29. Exhibits identified as petitioner's exhibits ("Petitioner's Exh. ___"), are those filed by Echavarria on October 16, 17, and 18, 2006, and November 18, 2011, and found in the Court's electronic filing system at dkt. nos. 107, 109, 110, and 137. In citing to other exhibits, the Court indicates their location in the record.

1        On March 26, 2007, upon an unopposed motion by Echavarria, the Court stayed

2   this case to allow Echavarria to return to state court to exhaust the unexhausted claims

3   in his amended petition. (Dkt. no. 118.) The stay was lifted on July 12, 2011, after

4   Echavarria's further state-court proceedings were completed. (Dkt. no. 133.) On

5   November 18, 2011, Echavarria filed a second amended petition for writ of habeas

6   corpus (dkt. nos. 136 and 139).

7        During the stay, Echavarria initiated two habeas corpus actions in state court. He

8   initiated one of those — his second state habeas action — on May 10, 2007, and his

9   petition in that action was denied by the state district court on January 8, 2008.

10   Petitioner's Exh. 425. He initiated the other — his third state habeas action — on May 2,

11   2008, and that petition was denied by the state district court on August 1, 2008. *See*

12   Appellant's Opening Brief, Exh. 1 to Motion to Vacate Stay and Reopen Capital Habeas

13   Corpus Proceeding, at 1 (dkt. no. 132-2 at 14). Echavarria appealed from the denial of

14   those petitions, and the appeals were consolidated. *Id.* On July 20, 2010, the Nevada

15   Supreme Court affirmed the denial of Echavarria's second and third state habeas

16   petitions. Order of Affirmance, Exh. 6 to Motion to Vacate Stay and Reopen Capital

17   Habeas Corpus Proceeding (dkt. no. 132-5 at 38-57). Rehearing was denied on

18   September 22, 2010. Order Denying Rehearing, Exh. 8 to Motion to Vacate Stay and

19   Reopen Capital Habeas Corpus Proceeding (dkt. no. 132-5 at 67-69). The United

20   States Supreme Court denied certiorari on April 4, 2011. Exh. 11 to Motion to Vacate

21   Stay and Reopen Capital Habeas Corpus Proceeding (dkt. no. 132-6 at 17). The

22   Nevada Supreme Court issued its remittitur on May 17, 2011. Remittitur, Exh. 12 to

23   Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding (dkt. no. 132-6

24   at 19).

25        In this federal action, on May 8, 2012, respondents filed a motion to dismiss

26   Echavarria's second amended petition. (Dkt. no. 145.) On March 20, 2013, the Court

27   granted that motion in part and denied it in part. (Dkt. no. 174.) The Court dismissed

28   ///

Claims 1, 5, 6, 8, 10, 13, 14 and the claims of ineffective assistance of counsel in Claim 9.

On July 24, 2013, respondents filed an answer (dkt. nos. 182, 183), responding to the remaining claims in Echavarria's second amended habeas petition: Claims 2, 3, 4, 7, 9 (in part), 11, 12, and 15. On December 9, 2013, Echavarria filed a reply (dkt. nos. 189, 190). On March 28, 2014, respondents filed a response to Echavarria's reply. (Dkt. nos. 197, 198, 201, 208.)

On December 9, 2013, along with his reply, Echavarria filed a motion for evidentiary hearing. (Dkt. nos. 191, 192.) Respondents filed an opposition to that motion on April 2, 2014. (Dkt. nos. 199, 200, 203.) Echavarria filed a reply on May 21, 2014. (Dkt. nos. 206, 207.)

The case is before the Court with respect to the merits of Claims 2, 3, 4, 7, 9 (in part), 11, 12, and 15 of Echavarria's second amended habeas petition, and with respect to Echavarria's motion for evidentiary hearing.

## III.   STANDARD OF REVIEW OF THE MERITS OF ECHAVARRIA'S CLAIMS

Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003). Section 2254(d) sets forth the primary standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)) (internal quotation marks omitted).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413) (internal quotation marks omitted). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (citing *Williams*, 529 U.S. at 409).

The Supreme Court has further instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

The state court's "last reasoned decision" is the ruling subject to section 2254(d) review. *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). If the last reasoned

1  state-court decision adopts or substantially incorporates the reasoning from a previous

2  state-court decision, a federal habeas court may consider both decisions to ascertain

3  the state court's reasoning. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007)

4  (en banc).

5      If the state supreme court denies a claim but provides no explanation for its

6  ruling, the federal court still affords the ruling the deference mandated by section

7  2254(d); in such a case, the petitioner is entitled to habeas relief only if "there was no

8  reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

9      The analysis under section 2254(d) looks to the law that was clearly established

10 by United States Supreme Court precedent at the time of the state court's decision.

11 *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Additionally, in considering the petitioner's

12 claims under section 2254(d), the federal court takes into account only the evidence

13 presented in state court. *Pinholster*, 131 S. Ct. at 1400-01.

14     If the petitioner meets the standard imposed by section 2254(d), the federal court

15 may then allow factual development, possibly including an evidentiary hearing, and the

16 federal court's review, at that point, is *de novo. See Panetti v. Quarterman*, 551 U.S.

17 930, 948 (2007); *Wiggins*, 539 U.S. at 528-29; *Runningeagle v. Ryan*, 686 F.3d 758,

18 785-88 (9th Cir. 2012).

19     Also, the federal court's review is *de novo* for claims not adjudicated on their

20 merits by the state courts. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Porter v.

21 McCollum*, 558 U.S. 30, 39 (2009).

22 **IV.   ANALYSIS**

23     **A.   Claim 4**

24     In Claim 4, Echavarria claims that his constitutional rights were denied because

25 of bias on the part of the trial judge. Second Amended Petition (dkt. no. 139), at 2.[2]

26 ───────────────
      [2]Echavarria filed this claim under seal (dkt. no. 139), and it has been litigated

27 under seal up to this point. This is because of the nature of the claim, which involves an
   FBI investigation that did not result in the filing of any charges. Also, Echavarria

28 received from the FBI, in discovery in this case, certain documents relative to this claim
   *( fn. cont...)*

1    Echavarria claims that the trial judge was biased against him because the victim,

2    FBI Special Agent John L. Bailey, had investigated the trial judge and the Colorado

3    River Commission (CRC) in 1986 and 1987 regarding an allegedly fraudulent land

4    transaction that the trial judge had been involved in as Chairman of the CRC (before he

5    became a state district court judge). Echavarria supports his claims with exhibits

6    regarding the alleged fraud and the FBI investigation. The evidence submitted by

7    Echavarria shows, beyond any dispute, that Agent Bailey had been centrally involved in

8    conducting the investigation of the trial judge, and that the alleged fraud and the FBI

9    investigation were of such significance that they would have had serious implications for

10   the trial judge. *See* Petitioner's Exhs. 501, 502, 503, 504, 505, 506, 507, 508, 509, 510,

11   511, 512, 513, 514, 515, and 516 (exhibits filed under seal).

12   Echavarria claims, and submits evidence to show, that the trial judge, the

13   prosecution, and even co-defendant Gurry's counsel knew before trial of the FBI's

14   investigation of the trial judge, but that he did not. Specifically, Echavarria alleges, and

15   submits evidence to show, that on September 17, 1990, well before his trial, there was a

16   conference involving the prosecution, Gurry's counsel, and the trial judge, at which

17   there was discussion of the fact that Agent Bailey had conducted an investigation of the

18

19   _____

*(… fn. cont.)*

20   under the terms of a protective order that was entered under seal on February 21, 2006
     (dkt. no. 104). The record, however, reflects that the general nature of the claim and the

21   basic factual allegations made by Echavarria in support of it have become matters of
     public record in Echavarria's state-court litigation. *See* Order of Affirmance, Exh. 6 to

22   Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding (dkt. no. 132-5
     at 38-57), at 11-13 (unpublished, but available at *Echavarria v. State*, Nos. 51042,

23   52358, 2010 WL 3271245, at *6 (Nev. July 10, 2010)); *see also* Exhs. 2 and 4 to Motion
     to Vacate Stay and Reopen Capital Habeas Corpus Proceeding (dkt. nos. 132-4 and

24   132-5) (state-court briefing in Echavarria's second state habeas action, filed unsealed in
     this action on June 15, 2011). Therefore, with respect to the general nature of the claim,

25   and the basic factual allegations made by Echavarria in support of it, there is no longer
     reason for the litigation of this claim to be conducted under seal.   In the interest of

26   transparency, and to resolve this claim in this unsealed order, the Court limits the
     description of the FBI investigation and the alleged fraud to facts that are of public

27   record.  Further detail regarding the FBI investigation and the alleged fraud is found in
     exhibits filed under seal by Echavarria.  *See* Petitioner's Exhs. 501, 502, 503, 504, 505,

28   506, 507, 508, 509, 510, 511, 512, 513, 514, 515, and 516 (exhibits filed under seal).

judge. A memorandum written by David T. Wall, one of Gurry's attorneys, on September 20, 1990, states:

> Judge Lehman [the trial judge] also indicated that his wife had been approached on 9/17/90 and told that Judge Lehman ought not to be presiding over the case since it was Agent Bailey who had investigated actions of Lehman on the Colorado River Commission prior to Lehman's appointment as a District Judge. Lehman indicated that he was not previously aware of this and wanted to make both sides aware of it, but both Bill Henry [prosecutor] and [Wall] indicated that they did not believe that it was in any way harmful or prejudicial.

Case Memorandum, Petitioner's Exh. 324, at 3. In a declaration, Wall states:

> During my representation of Mr. Gurry, I learned that the FBI had conducted an investigation of the Colorado River Commission at a time when Judge Lehman was a member of the Commission. Prior to trial, I participated in a telephone conference call with Judge Lehman and one of the prosecutors, either Mr. Henry or Mr. Harmon.
>
> *   *   *
>
> Judge Lehman indicated during the conference call that a reporter had asked him whether he would recuse himself in the trial of Mr. Gurry and Mr. Echavarria due to Judge Lehman having been a member of the Colorado River Commission at the time it was investigated by the FBI. Judge Lehman asked if either party wanted to move to have the judge recuse himself.
>
> Neither I nor the prosecution asked that Judge Lehman recuse himself.
>
> *   *   *
>
> I do not recall counsel for Mr. Echavarria participating in that discussion with Judge Lehman and the prosecutor about the FBI's earlier investigation of the Colorado River Commission.

Declaration of David T. Wall, Petitioner's Exh. 230 (paragraph numbering omitted). Echavarria's exhibits further show that on October 9, 1990, there was a meeting between representatives of the FBI and representatives of the Clark County District Attorney's Office, at which the FBI provided information to the district attorney's office regarding its investigation of the trial judge, so that the district attorney's office could consider whether that circumstance might lead to a possible judicial bias claim. Exh. 502 (filed under seal). At that meeting, an assistant district attorney stated that Gurry's counsel was aware of Agent Bailey's investigation of the trial judge, but Echavarria's

counsel was not. *Id.* The assistant district attorney stated that he would suggest a meeting in chambers with the trial judge, and with all counsel present, to discuss the matter. *Id.* Echavarria claims that no such chambers conference ever occurred. Echavarria's trial attorneys state, in declarations:

> During my representation of Mr. Echavarria, I was not aware that the FBI had conducted an investigation of Judge Lehman. I was unaware that FBI Special Agent John L. Bailey participated in an investigation of Judge Lehman.
>
> During my representation of Mr. Echavarria, I was unaware that the FBI had compiled any memos that detailed its investigation of Judge Lehman. During my representation of Mr. Echavarria, I was never served with an FBI memo that detailed the FBI's investigation of Judge Jack Lehman.
>
> The members of the Clark County District Attorney's Office who prosecuted Mr. Echavarria were William Henry and Mel Harmon. During my representation of Mr. Echavarria, neither Mr. Henry, Mr. Harmon, nor anyone else from the District Attorney's Office informed me of the FBI's investigation of Judge Lehman. I was not informed that anyone from the Clark County District Attorney's Office met with the FBI to discuss the FBI's investigation of Judge Lehman.
>
> Judge Lehman did not indicate to me at any time during my representation of Mr. Echavarria that he had been investigated by the FBI.
>
> Had I known that Judge Lehman had been investigated by FBI Special Agent John L. Bailey, I would have moved for Judge Lehman's recusal from Mr. Echavarria's case.

Declaration of David M. Schieck, Petitioner's Exh. 231 (paragraph numbering omitted); *see also* Declaration of Michael V. Stuhff, Petitioner's Exh. 232 (same).

Echavarria claims that Agent Bailey's investigation created judicial bias, and claims that the judge's bias was evidenced by the trial judge's alleged disparaging and embarrassing treatment of defense counsel.

Echavarria argues that the Nevada Supreme Court did not rule on the merits of this claim, and, therefore, the review of the claim in this federal habeas corpus action should be *de novo*. The record belies that argument. On his direct appeal, Echavarria raised a claim of judicial bias, focusing on the trial judge's alleged disparaging and embarrassing treatment of defense counsel, but not mentioning — because he did not yet know about it — the relationship between the judge and the victim. *See* Appellant's

1   Opening Brief, Exh. 101, at 62-72, 85-90. The Nevada Supreme Court denied the claim

2   without discussion. *See Echavarria*, 108 Nev. at 749, 839 P.2d at 599 ("We have

3   carefully examined appellants' numerous other assignments of error and determine that

4   they lack merit."). In Echavarria's second state habeas action, he again raised the

5   judicial bias claim, this time adding allegations regarding the FBI investigation of the trial

6   judge. *See* Appellant's Opening Brief Filed Under Seal, Exh. 2 to Motion to Vacate Stay

7   and Reopen Capital Habeas Corpus Proceeding (dkt. no. 132-4). The Nevada Supreme

8   Court ruled as follows on the claim as raised in that proceeding:

9
10          Echavarria argues that the district court erred by denying his claim
            that the trial judge was biased against him because Agent Bailey had
            investigated the trial judge regarding an allegedly fraudulent land
11          transaction that he had been involved in when he was Chairman of the
            Colorado River Commission. No prosecution against the trial judge
12          resulted from the FBI's investigation.

13          Echavarria suggests that Agent Bailey's investigation created
            judicial bias as evidenced by the trial judge's disparaging and
            embarrassing treatment toward counsel. As evidence of the trial judge's
14          animus, Echavarria points to numerous instances where the trial judge
            disparaged, "yelled at," and threatened counsel with sanctions
15          throughout the trial. Echavarria argues that had he been aware of the
            FBI investigation, he would have moved to disqualify the trial judge.
16
17          We conclude that the district court did not err by denying this
            claim. Echavarria raised a claim of judicial bias on direct appeal, arguing
18          that the trial judge made numerous disparaging and embarrassing
            comments about counsel. Although it appears that Echavarria did not
19          learn of Agent Bailey's investigation until well after trial, the incidents he
            identifies as evidence of judicial bias were largely raised on direct appeal
20          and rejected summarily by this court. *See Echavarria*, 108 Nev. at 749,
            839 P.2d at 599 ("We have carefully examined appellants' numerous
21          other assignments of error and determine that they lack merit."). In his
            post-conviction petition, Echavarria merely refined this claim, contending
22          that the genesis of the trial judge's bias was related to Agent Bailey's
            investigation of him. New information as to the source of the alleged bias
23          is not so significant as to persuade us to abandon the doctrine of the law
            of the case. *See Hall v. State*, 91 Nev. 314, 316, 535 P.2d 797, 799
24          (1975) (stating that "a more detailed and precisely focused argument"
            affords no basis for avoiding the doctrine of the law of the case).
            Accordingly, the district court did not err by denying this claim.
25
26   Order of Affirmance, Exh. 6 to Motion to Vacate Stay and Reopen Capital Habeas

27   Corpus Proceeding (dkt. no. 132-5 at 38-57), at 11-13. Therefore, the Nevada Supreme

28   Court did rule on the merits of the claim. On the appeal in Echavarria's second state

1   habeas action, the court concluded that Echavarria's newly developed evidence — he

2   apparently learned of the FBI investigation of the judge after his direct appeal, through

3   discovery in this federal habeas action — did not render the claim a new and different

4   claim, and could not overcome the doctrine of the law of the case. The court, therefore,

5   let stand its previous denial of the claim on its merits.

6       The Nevada Supreme Court's ruling that Echavarria did not establish actual bias

7   on the part of the trial judge appears objectively reasonable, and, with respect to the

8   actual-bias theory, this Court would hold that Echavarria does not meet the standard of

9   28 U.S.C. § 2254(d).

10      However, Echavarria also contends that the Nevada Supreme Court's denial of

11  this claim was an unreasonable application of clearly established federal law, as

12  determined by the United States Supreme Court, concerning implied judicial bias. Reply

13  (dkt. no. 190) (filed under seal). This Court agrees.

14      The Ninth Circuit Court of Appeals recently "catalogued the Supreme Court's

15  clearly established judicial bias jurisprudence" as follows:

16      The Supreme Court held long ago that a "fair trial in a fair tribunal is
        a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136,
17      75 S.Ct. 623, 99 L.Ed. 942 (1955). "Fairness of course requires an
        absence of actual bias in the trial of cases. But our system of law has
18      always endeavored to prevent even the probability of unfairness." *Id.*; *cf.*
        *Mistretta v. United States*, 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d
19      714 (1989) ("The legitimacy of the Judicial Branch ultimately depends on
        its reputation for impartiality and nonpartisanship."). This most basic tenet
20      of our judicial system helps to ensure both the litigants' and the public's
        confidence that each case has been adjudicated fairly by a neutral and
21      detached arbiter.

22      "The Due Process Clause of the Fourteenth Amendment
        establishes a constitutional floor, not a uniform standard," for a judicial
23      bias claim. *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S.Ct. 1793, 138
        L.Ed.2d 97 (1997). While most claims of judicial bias are resolved "by
24      common law, statute, or the professional standards of the bench and bar,"
        the "floor established by the Due Process Clause clearly requires a 'fair
25      trial in a fair tribunal' before a judge with no actual bias against the
        defendant or interest in the outcome of his particular case." *Id.* at 904-05,
26      117 S.Ct. 1793 (quoting *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456,
        43 L.Ed.2d 712 (1975)). The Constitution requires recusal where "the
27      probability of actual bias on the part of the judge or decisionmaker is too
        high to be constitutionally tolerable."  *Withrow*, 421 U.S. at 47, 95 S.Ct.
28      1456. Our inquiry is objective. *Caperton v. A.T. Massey Coal Co.*, 556

13

U.S. 868, 881, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). [Footnote omitted.]  We do not ask whether [the judge] actually harbored subjective bias. *Id.* Rather, we ask whether the average judge in her position was likely to be neutral or whether there existed an unconstitutional potential for bias. *Id.* "Every procedure which would offer a possible temptation to the average . . . judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the [accused] due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

[The petitioner] need not prove actual bias to establish a due process violation, just an intolerable risk of bias. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986); *see also Caperton*, 556 U.S. at 883, 129 S.Ct. 2252 ("[T]he Due Process Clause has been implemented by objective standards that do not require proof of actual bias.") (*citing Lavoie*, 475 U.S. at 825, 106 S.Ct. 1580; *Mayberry v. Pennsylvania*, 400 U.S. 455, 465-66, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); *Tumey*, 273 U.S. at 532, 47 S.Ct. 437). Thus, we must ask "whether 'under a realistic appraisal of psychological tendencies and human weakness,' the [judge's] interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" *Caperton*, 556 U.S. at 883-84, 129 S.Ct. 2252 (*quoting Withrow*, 421 U.S. at 47, 95 S.Ct. 1456). Due process thus mandates a "stringent rule" that may sometimes require recusal of judges "who have no actual bias and who would do their very best to weigh the scales of justice equally" if there exists a "probability of unfairness." *Murchison*, 349 U.S. at 136, 75 S.Ct. 623. But this risk of unfairness has no mechanical or static definition. It "cannot be defined with precision" because "[c]ircumstances and relationships must be considered." *Id.*

For instance, due process requires recusal where the judge has a direct, personal and substantial pecuniary interest in convicting a defendant. *Tumey*, 273 U.S. at 523, 532, 47 S.Ct. 437. Other financial interests also may mandate recusal, even if less direct. *Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *see also Ward v. Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (requiring recusal where village mayor with revenue production role also sat as a judge and imposed revenue-producing fines on the defendant); *Lavoie*, 475 U.S. at 824-25, 106 S.Ct. 1580 (requiring recusal where (1) a justice of the state supreme court cast the deciding vote and authored an opinion upholding punitive damages in certain insurances cases and (2) that same justice was a plaintiff in a pending action involving the same legal issues from which he obtained a large monetary settlement). Non-pecuniary conflicts "that tempt adjudicators to disregard neutrality" also offend due process. *Caperton*, 556 U.S. at 878, 129 S.Ct. 2252. A judge must withdraw where she acts as part of the accusatory process, *Murchison*, 349 U.S. at 137, 75 S.Ct. 623, "becomes embroiled in a running, bitter controversy" with one of the litigants, *Mayberry*, 400 U.S. at 465, 91 S.Ct. 499, or becomes "so enmeshed in matters involving [a litigant] as to make it appropriate for another judge to sit," *Johnson v. Mississippi*, 403 U.S. 212, 215-16, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971).

///

14

1    *Hurles v. Ryan*, 752 F.3d 768, 788-90 (9th Cir. 2014), *cert. denied sub nom Ryan v.*
2    *Hurles*, 83 U.S.L.W. 3139 (U.S. Dec. 1, 2014) (No. 14-191).

3    *Caperton*, one of the Ninth Circuit's catalogued cases, involved a state supreme
4    court justice whose top campaign donor in a previous election was the head of a mining
5    company and had spent $3 million on his behalf — more than all of his other supporters
6    combined. *See Caperton*, 556 U.S. at 873. When a high-stakes dispute involving the
7    mining company came before the court, the justice refused to recuse himself from
8    hearing it, and ultimately joined the 3-2 majority in ruling for the company. *See id.* at
9    873-74. The losing party claimed that the justice's participation in the case violated its
10   federal constitutional right to due process of law. The Supreme Court agreed, holding
11   that, by refusing to disqualify himself, the justice unconstitutionally deprived the parties
12   of a fair hearing. *See id.* at 886-87. The Court concluded that, under the circumstances,
13   there was "a possible temptation to the average . . . judge to . . . lead him not to hold the
14   balance nice, clear and true." *Id.* at 886 (alteration in original) (quoting *Lavoie*, 475 U.S.
15   at 825, *Monroeville*, 409 U.S. at 60, and *Tumey*, 273 U.S. at 532) (internal quotation
16   marks omitted). The Court held that, under the circumstances in *Caperton*, "the
17   probability of actual bias [rose] to an unconstitutional level." *Id.* at 886-87.

18   In view of the clearly established federal law, the Nevada Supreme Court's ruling
19   on this claim, on the appeal in Echavarria's second state habeas action, was objectively
20   unreasonable. The Nevada Supreme Court treated Echavarria's showing of the
21   relationship between the trial judge, the FBI, and the murdered FBI agent — which was
22   based on new evidence developed in discovery in his federal habeas action,
23   subsequent to his direct appeal — as no more than a refinement of the claim that he
24   made on direct appeal; that is, as merely "new information as to the source of the
25   alleged bias," and not significant enough to warrant abandoning the doctrine of law of
26   the case. Order of Affirmance, Exh. 6 to Motion to Vacate Stay and Reopen Capital
27   Habeas Corpus Proceeding (dkt. no. 132-5, pp. 38-57), at 12. The Nevada Supreme
28   Court's ruling turned on that court's view that Echavarria had not, on his direct appeal,

15

1   shown actual bias on the part of the trial judge, and its view that the new information
2   proffered by Echavarria did not change that conclusion. The Nevada Supreme Court did
3   not consider whether there was unconstitutional implied judicial bias. Specifically, the
4   Nevada Supreme Court did not consider whether the relationship between the trial
5   judge, the FBI and the murdered FBI agent, and the FBI's involvement in the case
6   would give rise to a possible temptation to the average judge to not hold the balance
7   nice, clear and true. *See Caperton*, 556 U.S. at 883; *Lavoie*, 475 U.S. at 825;
8   *Monroeville*, 409 U.S. at 60; *Tumey*, 273 U.S. at 532. This was an objectively
9   unreasonable application of federal law clearly established by the United States
10  Supreme Court. *See* 28 U.S.C. § 2254(d).

11      Viewing the claim *de novo*, this Court concludes that under the circumstances in
12  this case — including the relationship between the trial judge, the FBI, and the murder
13  victim, the nature of the FBI's investigation, and the involvement of the FBI in the case
14  — it was constitutionally intolerable for the trial judge to preside over the case. This
15  Court does not here determine that in fact the trial judge was influenced by his
16  relationship with the murder victim or the FBI, or, in other words, that he harbored actual
17  or subjective bias. *See Caperton*, 556 U.S. at 881; *Lavoie*, 475 U.S. at 825; *Hurles*, 752
18  F.3d at 789. Rather, this Court's inquiry is "whether sitting on the case . . . would offer a
19  possible temptation to the average . . . judge to . . . lead him not to hold the balance
20  nice, clear and true." *See Caperton*, 556 U.S. at 883 (quoting *Lavoie*, 475 U.S. at 825,
21  *Monroeville*, 409 U.S. at 60, and *Tumey*, 273 U.S. at 532 (internal quotation marks
22  omitted)).

23      Four years before Echavarria's trial, the murder victim, FBI Agent Bailey, had
24  conducted an investigation of serious fraud allegations concerning the trial judge. The
25  trial judge was aware of that FBI investigation, as was the prosecution (and even
26  counsel for Echavarria's co-defendant), but Echavarria was not informed of it. The FBI
27  played an important part in investigating Agent Bailey's murder and in apprehending
28  Echavarria. There was an issue in the case regarding the treatment of Echavarria in

Juarez, after his arrest was made through cooperation between the FBI and the police in Juarez. *See infra* Part IV.B. Several FBI agents testified, both at the evidentiary hearing regarding the admissibility of the statement given by Echavarria after his arrest in Juarez, and at trial. Under these circumstances, this Court concludes that there was a significant risk that an average judge would possibly be tempted to lean in favor of the prosecution or to potentially have an interest in the outcome of the case. *See Bracy*, 520 U.S. at 904-05; *Hurles*, 752 F.3d at 788. For example, an average judge in this judge's position might be tempted to demonstrate a lack of bias by overcompensating and ruling in a manner to avoid any suggestion that the judge harbored ill will against the FBI, or against the FBI agent murder victim, for having conducted the investigation. Or, to give another example — keeping in mind that the inquiry is to be made "under a realistic appraisal of psychological tendencies and human weakness," *Caperton*, 556 U.S. at 883-84 — an average judge in this judge's position might be tempted to avoid rulings unfavorable to the FBI, or to the prosecution of the FBI agent's alleged murderer, in order to appease the FBI and avoid any further investigation. Either of these inclinations would have tended to lend bias and tip the scales against Echavarria.

In this Court's view, it is an inescapable conclusion that the risk of bias on the part of the trial judge in this case was too high to allow confidence that the case was adjudicated fairly, by a neutral and detached arbiter, consistent with the Due Process Clause of the Federal Constitution. *See Caperton*, 556 U.S. at 883-84; *Hurles*, 752 F.3d at 788-90. As the Ninth Circuit recently reminded us, "[d]ue process . . . mandates a 'stringent rule' that may sometimes require recusal of judges 'who have no actual bias and who would do their very best to weigh the scales of justice equally' if there exists a 'probability of unfairness.'" *Hurles*, 752 F.3d at 789 (quoting *Murchison*, 349 U.S. at 136). This Court can only conclude that the circumstances here created an "intolerable risk of bias." *Id.* Echavarria's federal constitutional right to due process of law was violated.

///

"[W]hen a defendant's right to have his case tried by an impartial judge is compromised, there is structural error that requires automatic reversal." *Greenway v. Schriro*, 653 F.3d 790, 805 (9th Cir. 2011) (citing *Tumey*, 273 U.S. at 535, and *Chapman v. California*, 386 U.S. 18, 23 (1967)). The Court will, therefore, grant Echavarria habeas corpus relief with respect to Claim 4.[3]

## B.    Claim 3

In Claim 3, Echavarria claims that his constitutional rights were denied "due to the trial court's failure to suppress Mr. Echavarria's statement given to the Mexican police while being subjected to torture." Second Amended Petition at 59.[4]

Before trial, Echavarria moved to suppress the statement he gave to the police in Juarez, Mexico, on June 27, 1990, the morning after his arrest. *See* Motion to Suppress, Exh. 23. The trial court, with Judge Lehman presiding, held a two-day evidentiary hearing with respect to that motion. *See* Exhs. 30 and 31 (transcript). At the

---

[3]Echavarria requests an evidentiary hearing with respect to Claim 4. *See* Motion for Evidentiary Hearing (dkt. no. 191), at 4; Motion for Evidentiary Hearing as to Claim 4 (dkt. no. 192) (filed under seal). The Court concludes that an evidentiary hearing is not warranted. The facts upon which the Court grants Echavarria relief — that the murder victim had been, about four years before trial, centrally involved in conducting an FBI investigation of the trial judge, and that the trial judge and the prosecution knew of that investigation before trial, but did not inform Echavarria of it — are undisputed. Respondents do not appear to challenge any of these facts, and they oppose the request for an evidentiary hearing. *See* Opposition to Motion for Evidentiary Hearing as to Claim 4 (dkt. no. 199) (filed under seal). An evidentiary hearing is not warranted if there are no disputed facts and the claim presents purely a legal question. *Beardslee v. Woodford*, 327 F.3d 799, 823 (9th Cir. 2003), *as amended* 358 F.3d 560, 585 (9th Cir. 2004).

[4]Claim 3 also includes *pro forma* claims of ineffective assistance of counsel. *See* Second Amended Petition at 63. Echavarria has provided no substantive argument regarding those claims. *See id.*; Reply at 22-33. The Court sees no indication in the record that such claims have been asserted in the Nevada Supreme Court. *See* Exh. 101 (Echavarria's opening brief on direct appeal); Exh. 127 (Echavarria's opening brief on appeal in first state habeas action); Exh. 1 to Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding (dkt. nos. 132-2, 132-3) (Echavarria's opening brief on appeal in second state habeas action). The Court generally cannot grant relief on a claim not exhausted in state court. *See* 28 U.S.C. § 2254(b). And, at any rate, any such claim is procedurally defaulted. *See* Exh. 6 to Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding, at 2-11 (dkt. no. 132-5 at 39-48) (Nevada Supreme Court's Order of Affirmance in second state habeas action, ruling claims of ineffective assistance of counsel to be procedurally barred).

1   conclusion of the evidentiary hearing, the trial court denied the motion. *See* Exh. 31 at

2   336-40.

3          At the evidentiary hearing, the defense called as a witness Lake Headley, an

4   investigator working on Echavarria's case. Exh. 30 at 23-31. Headley testified that he

5   had obtained the shirt that Echavarria was wearing when he was arrested in Juarez. *Id.*

6   at 24. Several buttons were missing from the shirt, and there were dark brown stains on

7   the shirt. *Id.* at 29-30.

8          Next, the defense called as a witness Fernando Karl, a Deputy United States

9   Marshal stationed in El Paso, Texas. Exh. 30 at 31-44. Karl booked Echavarria into

10  federal custody in El Paso on June 27, 1990, after he was delivered to the Federal

11  Bureau of Investigation (FBI) by the Mexican police. *Id.* at 32, 39. Karl testified that

12  Echavarria had marks on his wrists and a bruise behind one of his ears. *Id.* at 41. Karl

13  testified that Echavarria told him the Mexican police caused those marks. *Id.* at 33. Karl

14  testified that Echavarria told him that he had been beaten after his arrest in Juarez. *Id.*

15  at 37, 42. Karl therefore had photographs taken of Echavarria, and those photographs

16  were admitted into evidence. *Id.* at 32-34, 43-44. On cross-examination, Karl testified

17  that, when he booked Echavarria, and asked if he had any physical complaints, or

18  injuries or illnesses, Echavarria responded that he had none, and that he was only "a

19  little sore." *Id.* at 39-40, 42.

20         Echavarria then testified. Exh. 30 at 45-80. Echavarria testified that he was

21  arrested at the airport in Juarez and taken to a police station in that city. *Id.* at 46-47.

22  Echavarria testified further as follows:[5]

23         Q.     Okay. And when they took you to the station what happened
       first?

24

25         A.     The first thing that happened while we're in the car they were
       saying bad words to me. They would be hitting me on the face. They were
26     telling me that the United States police was looking for me because I had
       committed a crime. And they started asking me question, where were the

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯
       [5]Echavarria testified through an interpreter. His testimony is quoted as it appears
28  in the transcript.

19

weapons, where was my luggage, where were my things. Between the striking and the questioning we finally arrived to the police station. And they introduced me on the first floor to one that they call the Commandante.

Q.   And what did the Commandante do?

A.   He is like the head of all of them. And he told me there for me to try to cooperate. Try to cooperate in answering the question that they would make otherwise Maria would be paying the consequences and the sister-in-law and the brother —

\*   \*   \*

Q.   (By Mr. Stuhff [defense counsel]) Okay. What did they say would happen to Maria and the brother-in-law?

A.   That if I did not cooperate with them they were going to mistreat them. And then the Commandante asked me things which I told him I did not know. Like for instance where the weapons were, what I had done in Las Vegas, why was the police looking for me; if it was true that I had had a problem with an FBI agent in Las Vegas. I told him I knew nothing.

They kept asking me several times the same questions. And since I would not answer they took me to a room on the second floor, and then there a subordinate of the Commandante and other agents, about six or seven agents they started beating me up, striking me on the face. They would grab me —

\*   \*   \*

Then they — everything started up again. They told me to remove my clothes. They — in general they removed it. They grabbed my shirt. Then they told me to open my legs, I think that would be spread my legs. And they started beating me up. And then I kept saying to them, please don't hit me, that they didn't have the right to hit me.

Q.   With what did they beat you?

A.   They first hit me with their hands, bare hands, they had not blindfolded me yet. After they had me for an hour or hour and a half I think, I am not too sure about the time, they took me down the first floor again.

Q.   And who was there?

A.   There was the Commandante, the same man, and two FBI agents from the United States identified themselves to me. They told me who they were. One spoke Spanish and the other one spoke very little Spanish. And they asked me then if I was ready to make a confession. I told them I knew nothing.

\*   \*   \*

Q.   (By Mr. Stuhff) And what did the FBI man say to you?

20

A.     Many things. After identifying himself he asked me where were the weapons, where was the car that I had brought over, and what did Carlos Gurry Rubio have to do with this problem? To collaberate [sic] with them and that if I did I would come out all right. I at no time was ever informed of any of my rights. They never told me about an attorney. When I refused to answer their questions the Commandante told his agent to take me upstairs to the second floor again.

And in the second floor they took my clothes off again. And since I was handcuffed they told me to spread my legs again. With that same shirt, the same one that's up there they blindfolded me. Then I felt like they had something covering their hands. And they were trying to avoid hitting me on the face, but even like that they struck me over my body. They wouldn't beat me continuously, they would beat me and then stop. And they would threaten me and pressure me some more.

Q.     Okay. What sorts of threats did they make towards you?

A.     They grab a gun, they would make it sound like when it's being cocked and they would put that next to my ear so that I knew that it was gun and then they put it against my head. And they told me that they were going to shoot me and throw me into the river. Then they would keep on beating me.

I heard the cabinet that was there like being opened. I didn't see what kind of machine, I can't say I saw. I cannot tell either who was the one that applied the current. They had me blindfolded and I was handcuffed. And they kept telling me we're going to see if you like this shithead. And then I told them to please not do anything else to me.

Q.     Did you hear anything while they made those preparations with that machine?

A.     I don't know how to identify it exactly, but I have been a welder in my country and I know the noise that a welding machine would make. I don't want to say that these is a welding machine, but it would make a similar noise. A noise, I don't know how to identify it. And then is when they said if I was going to like what they were going to do to me. And they would little by little give me electricity. Not constantly, but they would do touches, contact so that I knew they were serious about it.

Q.     Okay. Where would they touch you with the electricity?

A.     In my parts.

Q.     Okay. And by that are you referring to your private parts?

A.     Yes.

Q.     And when they did that what did they say to you, Jose?

A.     Lots of bad words. I don't know if I can say the words, but if I say them I'll say them in Spanish.

Q.     Would you tell us.

21

A.      That I was a son of a bitch and that I would pay with my life what I was doing. And that I was going to be thrown into the river because I was a shithead. And they were going to see if once I got out of there I was going to be such a man, since they were doing that stuff to me. A lot of stuff that they were telling me. That people like me didn't deserve to go to trial, society should dispose of us.

Q.      Jose do you remember what else they told you when they were applying the electricity to your private parts, when they were getting ready to do that?

A.      They said so many things. And they kept asking me in between where were the weapons. If I was ready to make a confession. And then they would bring me back down to the first floor and there was a tall white hair man who was a FBI of the United States. And then he would ask me again whether I was going to cooperate with them. And that lasted probably three, four hours, I think, I lost count of time. They would strike me on the head, they would drag me by the hair and they would beat my head against the wall in the cell.

The second time that I came down to the first floor I was taken to the cell, a cell that was downstairs in the basement and that's where Maria Garcia and her sister saw how my face looked, and the sister-in-law; that's where they saw me.

They had me at a cell downstairs. They sat me with my back against the iron bars and they handcuffed me through the outside of the railing. They put a man there to watch. I was there about an hour. I went up again about an hour later to the first floor.

The FBI agents had something like a statement that they told me I had to sign. First they asked me — that they were going to ask me things that were in there and whether I agree. I had been beaten up quite a bit. By then I felt very weak. And so that I would get out of that problem I just told them that whatever was there was fine and that I would do whatever they want me to do, but to stop; to stop doing things to me and to the other people that were there because of me.

While I was there they called the Commandante on the phone and then when he answered the phone he said that phone call was not for him, that they were calling from El Paso in the United States. And the American man grabbed the phone and he started speaking in English. I did not understand what they were saying, but perhaps it had to do with the fact that I had been arrested or stuff like that.

They make me sign a paper there. I was not given a copy or anything of that paper. Then they kept on asking where were the weapons. And they remained doing that for like almost all night. And then I believe they found the weapons. They found the car by the airport. My belongings that had been left at the airport, they also found them and they never showed up here in the States, I don't know. They just kept everything.

Then they took me back down to the cell down in the basement. They sat me again on the floor and they handcuffed by the rail. They put

water on the floor, I don't know why, so that it would be wet. And every so often they would hit me on the head. They told me I was a liar. That I was giving them a lot of work. And that if I would have cooperated with them they wouldn't have to be going around the whole city. And that was the main part of the story of what happened to me. And I can't explain all the bad words that they used and all the threatening things they did to me, but it was really a bad time that I had.

Q.     What did they tell you they were going to do to Maria?

A.     That if I wouldn't cooperate they would beat her and that they did. They hit her. They hit her sister-in-law and not even a week before she had lost baby, my baby. And they did strike her too.

Q.     What else specifically did they say that they were going to do to Maria, Jose; I know it's difficult to get into some of those details?

A.     To see if it was going to feel good to here when they tried to tighten her nipples, the breast nipples. And that they were going to do obscene things to her.

THE COURT:  Do what?

THE INTERPRETER:  Obscene things to her.

Q.     (By Mr. Stuhff)  And so after they said and did those things did you finally sign the statement that they gave to you?

A.     I had no alternative.

*     *     *

Q.     And at which point did they present that document to you to sign?

A.     At that point I had already been up to the second floor twice and I had been once down to the cell downstairs where they had the other inmates. And when I went up there is when I signed the statement. After that when they brought me downstairs they didn't bug me any more. Not the FBI agents but the other agents kept on bugging me, because they told me that I had given them a lot of work and things like that.

Q.     Okay. So at the time that you signed this statement was that after the electricity and after the beatings?

A.     Yes, of course; twice, three times or more. And also at El Paso the federals asked me what happened to my body.

*     *     *

Q.     Mr. Echavarria I'm showing you what's been marked for identification as Exhibit A. I'd ask you to look at this shirt. Would you take that please.

A.     What —

23

Q.      Is that the shirt that you were wearing the night that this happened?

A.      Yes, of course.

Q.      Okay. And directing your attention to the front of the shirt to where the buttons used to be —

A.      They ripped them off, because they pulled my shirt to remove it. You can tell that they've been ripped off. You can tell they were not taken out.

Q.      And there's stains on that shirt. Can you tell us what those stains are?

A.      I don't know if it's blood or sweat or what. They used — they beat me while I still had it on, then they used it to blindfold me. I don't know if it's blood or something similar.

Q.      Okay. Did those stains get on the shirt during the course of your beating?

A.      Uh-huh. Of course.

Exh. 30, pp. 48-58.  On cross-examination, Echavarria testified further as follows:

Q.      Let's go back to when you were arrested in Mexico and taken to the police station. Did you tell us that in the first instance you were stripped, your legs were spread and you were beaten for at least an hour?

A.      Uh-huh. Yes.

Q.      Were you beaten between the legs for at least an hour?

A.      No.

Q.      How long were you beaten between the legs?

A.      They beat me about my body. In my parts they struck me about twice only.

Q.      Now at this time you weren't blindfolded, were you?

A.      No.

Q.      So what were you struck in your parts with?

A.      They struck me with their feet, with the hands, with the knees, everything.

Q.      So you were punched in the groin, kicked in the groin and kneed in the groin?

A.      Uh-huh. Yes.

24

Q.    And this was while your legs were spread and you were helpless to block the blows, is that correct?

A.    Yes.

Q.    And the rest of the time for over an hour you were beaten in the face?

A.    I — and they were not striking me for a whole hour continuously. Between the beatings, threatening me and the questioning that lasted about an hour to an hour and a half, more or less. Maybe they would hit me twice and then they would ask me, are you going to talk? Then I would say I didn't know anything. They then would say bad words and they would strike me again.

Q.    I think I understand. My question to you is how many times were you punched in the face by a man's fist?

A.    Not with a fist with an open hand. Yes, many times.

Q.    Were you hit across the eyes with the open —

A.    And I think they were trying to avoid leaving markings.

Q.    Okay. Were you hit across the eyes with an open hand?

A.    Yes.

Q.    Were you hit across the nose with an open hand?

A.    No.

Q.    Were you hit in the mouth with an open hand?

A.    Yes. Yes and really hard.

Q.    Were all of these blows really hard?

A.    Yes.

                              *    *    *

Q.    Let's talk about the FBI agents. Did they ask you to confess?

A.    Yes.

Q.    Did they tell you that if you didn't confess that you were going to be abused some more?

A.    Not exactly in those words.

Q.    Well, in what words did they tell you that?

A.    Whether I was ready to confess.

                              *    *    *

25

Q.    . . .  After you met the FBI agents for the first time you were taken to the second floor again, is that correct?

A.    Yes.

Q.    And current was applied to your body, is that correct?

A.    Yes.

Q.    Exactly where on your body was this electrical current applied?

A.    Do you want me to show you or tell you?

Q.    Do you know the words?

A.    In Spanish it says in my penis. I don't know what do you say it in English.

Q.    You have an interpreter. So you're telling me —

A.    Okay. Right here on this, how do you say in English?

Q.    Was current applied to your penis?

                                        *    *    *

A.    Yes.

Q.    Was current applied anywhere else?

A.    In my balls.

Q.    Are you referring to your testicles?

A.    Yes.

Q.    Was current applied anywhere else?

A.    No.

                                        *    *    *

Q.    After all this you signed the statement is that correct?

A.    Yes.

*Id.* at 71-78. Echavarria testified on cross-examination that when he was booked into custody in Las Vegas, about fifteen days after his arrest, he was seen by a doctor and a nurse, and he did not tell them that he had been abused in Mexico. *Id.* at 69-71.

The defense also called as a witness Oren J. Gordon, a private investigator from Phoenix, Arizona, who had previously been employed by the United States Drug

26

Enforcement Administration (DEA). Exh. 31 at 257-73. As a DEA agent, Gordon had worked in the border region including El Paso and Juarez. *Id.* at 258-59. Gordon testified that he had received briefings and training regarding torture methods used by Mexican authorities. *Id.* at 259-64. Gordon testified:

> Q.      And as a member of the Drug Enforcement Administration, did you and your fellow agents discuss the reputation of Mexican law enforcement officials for utilizing torture or physical abuse to obtain statements from suspects or witnesses?
>
> A.      Yes, we did.
>
> Q.      And what was the general reputation of law enforcement agents in Mexico, for the use of physical abuse and torture, to obtain statements from suspects and witnesses?
>
> A.      It was a common occurrence. It was a regular technique used to entice the person or induce the person to say what they wanted him to say, or her.

*Id.* at 265; *see also id.* at 267. Regarding electrical torture devices, Gordon testified that those with transformers would make a humming sound, and generally could cause a great deal of pain without leaving marks on the skin. *Id.* at 265, 268-69, 273.

The defense also called as a witness Susana Reyes, an attorney familiar with the city of Juarez. Exh. 31 at 311-23. Reyes testified that police officers in Juarez had a reputation for using torture to extract statements from criminal suspects. *Id.* at 321.

The prosecution called as a witness Juan Briones, a special agent for the United States Immigration and Naturalization Service, stationed in El Paso. Exh. 30 at 81-103. Briones was present and observed Echavarria when he was deported from Mexico into the United States on June 27, 1990. *Id.* at 82-86. Briones testified that he saw nothing in the way Echavarria walked, moved, or spoke to indicate that he had been injured. *Id.* at 86-87. Briones testified that he saw no injuries on Echavarria's face, or anywhere else on his body. *Id.* at 88. He testified that Echavarria made no complaint of physical abuse. *Id.* at 90.

The prosecution also called as a witness Stanley Serwatka, the chief of the El Paso division of the United States Attorney's Office. Exh. 30 at 103-25. Serwatka

1  testified that he saw Echavarria in El Paso, and saw no indication that he was injured.

2  *Id.* at 114-15. However, Serwatka testified on cross-examination that Karl told him that

3  Echavarria said he had been beaten by the police in Juarez. *Id.* at 122-23.

4  The prosecution also called as a witness Jose Refugio Rubalcava, the Deputy

5  Chief of the Judicial State Police for the Northern Zone of the State of Chihuahua, in

6  Juarez — the "Commandante" referred to by Echavarria. Exh. 30 at 126 to Exh. 31 at

7  177. Rubalcava testified that when Echavarria was brought to the police station on June

8  26, 1990, he saw no indication that he was injured. Exh. 30 at 128. Rubalcava testified

9  that when he was brought in, Echavarria had already confessed. *Id.* Rubalcava testified

10  that Echavarria was interrogated at the police station. Exh. 31 at 150, 153. Rubalcava

11  testified that the next morning, June 27, 1990, his secretary took the statement from

12  Echavarria, and Echavarria signed it in his presence. Exh. 30 at 128-32. According to

13  Rubalcava, Echavarria was informed that he had the right to remain silent and the right

14  to have an attorney. *Id.* Rubalcava testified as follows:

15      Q.    Was Mr. Echavarria physically abused in your police station?

16      A.    Not that I know of.

17                      *   *   *

18      Q.    Mr. Echavarria has told us that he was tortured with some
sort of electrical device taken from a metal cabinet. Is there any such

19  device in your police station?

20      A.    No sir. And there was no need because actually he, when he
was captured at the airport he already confessed killing the man.

21                      *   *   *

22      Q.    Did you ever see any indication that Mr. Echavarria was
being beaten by anyone in your police station?

23

24      A.    No.

25      Q.    Did he ever complain to you that he was being beaten?

26      A.    No.

27      Q.    Did you ever tell him to confess or he would be beaten or
beaten some more?

28

A.    No. He — as I told you, when he was brought to my office the first time, the 26, when he was captured at the airport, when he was brought to my office he was already — he already confessed killing the agent.

Q.    Do you ever — while he, while Mr. Echavarria was in your police station did you ever see any bruises about his face or his head?

A.    No.

Q.    Did he ever give any sign that he was injured in the area of his groin?

A.    No. Of course not.

*Id.* at 130-33. On cross-examination, Rubalcava testified:

Q.    (By Mr. Stuhff [defense counsel]) Is it your testimony that your agency has never used torture in the use of obtaining —

A.    Not that I know of. Not that I know of.

Exh. 31 at 156. On cross-examination, Rubalcava confirmed that Maria Garcia, her former husband, and her brother were brought to the police station and held for questioning. *Id.* at 157-59, 171-73. Rubalcava testified on cross-examination that the statement signed by Echavarria was a combination of information provided by Echavarria and information received from other sources, including the FBI. *Id.* at 159-61. Rubalcava testified on cross-examination that when Echavarria left the Juarez police station, he was not bruised, swollen or hurt, and he had no complaints of any physical injury or weakness. *Id.* at 163. Rubalcava testified on cross-examination that he held a press conference at the police station to announce Echavarria's arrest, and Echavarria made no complaint to the reporters of any mistreatment, and "[he] told the press how he killed the agent." *Id.* at 164-65. Rubalcava also testified on cross-examination regarding the reputation of his police department:

Q.    What is the reputation of you department in general, for brutality?

A.    Good.

*Id.* at 175.

29

The prosecution then called as a witness David E. Hatch, a homicide investigator with the Las Vegas Metropolitan Police Department (LVMPD). Exh. 31 at 179-86. Hatch received Echavarria into custody in Las Vegas on July 10, 1990. *Id.* at 179. Hatch was told by a nurse on the medical staff at the Clark County Detention Center (CCDC) that Echavarria said he was tortured. *Id.* at 181-82. Hatch had photographs of Echavarria's body taken on July 11, 1990. *Id.* at 179-81.

Next, the prosecution called as a witness Dr. Richard Winston Meyers, the Medical Director at the CCDC. Exh. 31 at 186-205. Dr. Meyers examined Echavarria on July 11, 1990. *Id.* at 187. Dr. Meyers testified as follows:

> Q.     Would you tell the Judge, please, what your findings and opinions were as a physician?
>
> A.     I have an extensive dictation transcription on [the] medical findings. If I'm allowed, may I read the impression, the final impression?
>
> Q.     Would you, please?
>
> *     *     *
>
> THE WITNESS:  Okay. Thank you. Under impression on that last page: Number one, the inmate generally appears in good condition. Number two, the inmate complains of generalized tenderness and discomfort throughout the chest cage without any external clinical findings aside from the two small abrasions on the left-posterior mid-back. Number three, recent abrasions about the [wrists] consistent with handcuffs, with secondary mild neuropraxia, right hand, which is a temporary numbness.
>
> Number four, mild tenderness in the left knee with findings of old injury or surgery, but no signs of recent trauma. Number five, mild scrotal pain without clinical findings. Addendum; there is a small contusion noted about the sacrum. That's the tail bone, with minimal associated tenderness. These were my primary conclusions on the physical examination.

*Id.* at 190-91. On cross-examination, Dr. Meyers testified that Echavarria had told him, at the time of the examination, that he had been tortured in Mexico. *Id.* at 192-93. Dr. Meyers testified on cross-examination that it could not be determined what caused the pain in Echavarria's scrotum, the bruise near his tail bone, or the tenderness around his chest cage. *Id.* at 198-202.

///

1    Next, the prosecution called as a witness Alvaro Cruz, an FBI agent stationed in

2  El Paso. Exh. 31 at 205-27. Cruz went to the police station in Juarez on June 26, 1990,

3  and saw Echavarria there. *Id.* at 206-08. He testified that he did not see any indication

4  that Echavarria had been injured. *Id.* Cruz also testified that he saw Echavarria a few

5  days later at a jail in El Paso, and, again, saw no sign of injury. *Id.* at 208. On cross-

6  examination, Cruz testified that he had a working relationship with Rubalcava, and that

7  they cooperated on a regular basis. *Id.* at 212. Cruz testified that he called Rubalcava

8  on the morning of June 26, 1990, and asked for Rubalcava's cooperation on this case,

9  which was a priority because it involved the killing of an FBI agent. *Id.* at 211-12. Cruz

10  testified that, at the police station in Juarez, he went into the room where Echavarria

11  was being questioned, and participated in questioning Echavarria. *Id.* at 213-17. Cruz

12  testified that FBI Agent Marquez advised Echavarria of his *Miranda* rights. *Id.* at 216-17.

13    The prosecution then called as a witness Manuel Marquez, another FBI agent

14  stationed in El Paso. Exh. 31 at 228-55. Marquez testified that he, too, went to Juarez

15  on June 26, 1990, and participated in interviewing Echavarria. *Id.* at 228-55. He testified

16  that he advised Echavarria of his *Miranda* rights. *Id.* at 231, 245-46. Marquez testified

17  that he saw no indication that Echavarria had been injured. *Id.* at 230-32. Marquez

18  testified that he was present when Echavarria was transported into El Paso, and, at that

19  time as well, he saw no indication that Echavarria had been injured. *Id.* at 235. On

20  cross-examination, Marquez testified that he knew Rubalcava, and worked with him on

21  a regular basis. *Id.* at 238-39. Marquez testified that he considered there to be a team

22  working on the case, including LVMPD, the FBI in Las Vegas, the FBI in El Paso, and

23  Commandante Rubalcava. *Id.* at 240. On cross-examination, Marquez testified that he

24  did not obtain any written acknowledgement from Echavarria that he had been advised

25  of his *Miranda* rights, explaining that he did not have a form. *Id.* at 246-47, 251. On

26  cross-examination, Marquez testified that the police in Juarez had a reputation in El

27  Paso and Juarez for obtaining statements by torture. *Id.* at 254-55.

28  ///

1    At the conclusion of the evidentiary hearing, the trial court stated that the motion

2    to suppress turned primarily upon Echavarria's testimony, and found his testimony to be

3    incredible "in light of the physicals given him, in light of the pictures . . . , and in light of

4    the testimony that he gave . . . ." Exh. 31 at 336-37. The trial court found it of no

5    moment that the statement was drafted to include information from sources other than

6    Echavarria himself. *Id.* at 338-39. The trial court found that if Echavarria was forced in

7    Juarez to sign an inaccurate statement, he could have pointed out any inaccuracies in

8    the statement to the FBI, or to the press on the occasions when he made statements to

9    the press, but that he did not do so. *Id.* The trial court observed that there had been no

10   mention by the press of any indication that Echavarria was abused. *Id.* at 338-39. The

11   trial court acknowledged the testimony that some torture by means of electrical devices

12   might leave no marks, but found that there was no evidence that when Echavarria

13   signed the statement he looked like he had been "beaten during the course of the night

14   at various times and then questioned and beaten again, which would in my mind, no

15   question, have resulted in him looking like a fighter who had been through a very tough

16   fight over an extended period of time, but surely a fighter that had gone, let's say, ten

17   rounds." *Id.* at 339. The trial court found the FBI agents who testified to be credible, and

18   that any divergence between the testimony of Cruz and Marquez was insignificant. *Id.* at

19   339-40. The trial court found that "there was nothing to dispel the testimony of

20   Commandante Rubalcava." *Id.* The trial court found it of no significance that the FBI

21   agents did not have a form available to have Echavarria acknowledge in writing that he

22   received *Miranda* warnings. *Id.* at 340. The trial court concluded: "With all of that,

23   therefore, I deny your motion to suppress." *Id.*

24   Echavarria raised this issue on his direct appeal to the Nevada Supreme Court.

25   *See* Appellant's Opening Brief, Exh. 101, at 98-100. The Nevada Supreme Court ruled

26   as follows:

27       Echavarria contends that the district court erroneously admitted
         into evidence his confession to Juarez police officers. At the evidentiary
28       hearing on the matter, Echavarria insisted that he signed the confession

only as a result of interrogation and torture by the Mexican authorities. He also stated that United States agents cooperated and collaborated in the torture efforts. The alleged torture included beatings and electrical shocks to the genital area.

The district court determined that the confession was voluntary. In addition, the court instructed the jurors to determine for themselves whether the confession was voluntary and if not, to disregard it in their deliberations. On appeal, Echavarria continues to ascribe error to the district court's refusal to suppress the Juarez confession.

"A confession is admissible as evidence only if it is made freely, voluntarily, and without compulsion or inducement." *Franklin v. State*, 96 Nev. 417, 421, 610 P.2d 732, 734 (1980). A criminal conviction based in whole or in part upon an involuntary confession is a denial of due process, even if there is ample evidence aside from the confession to support the conviction. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Therefore, our examination of this issue occurs without reliance on the overwhelming evidence of Echavarria's guilt.

Echavarria's allegations of physical abuse are not taken lightly by this court. However, our review of the record of the suppression hearing convinces us that the admission of Echavarria's confession was proper. The district court heard two days of conflicting testimony about the voluntariness of the confession obtained in Mexico, and determined that Echavarria's testimony was not credible. The trial umpire was in a better position than this court to judge the truthfulness of Echavarria's testimony vis-a-vis the evidence produced by the State. Factors militating against Echavarria's testimony included the absence of physical marks consistent with the beatings he allegedly suffered, the testimony of witnesses who refuted Echavarria's version of the events, Echavarria's failure to immediately report the alleged abuse to authorities, and inconsistencies in Echavarria's testimony.

> Where pure factual considerations are an important ingredient [in evaluating the voluntariness of a confession], which is true in the usual case, appellate review . . . is, as a practical matter, an inadequate substitute for a full and reliable determination of the voluntariness issue in the trial court and the trial court's determination, *pro tanto*, takes on an increasing finality.

*Jackson*, 378 U.S. at 390-91, 84 S.Ct. at 1788. The conclusion by the district court that the confession was not coerced is supported by substantial evidence and we will not disturb it on appeal. *See Franklin v. State*, 96 Nev. 417, 421, 610 P.2d 732, 735 (1980).

*Echavarria*, 108 Nev. at 742-43, 839 P.2d at 595.

The admission into evidence of an involuntary or coerced confession is a violation of a defendant's right to due process of law under the Fourteenth Amendment. *Jackson v. Denno*, 378 U.S. 368, 385-86 (1964). A confession is involuntary if it is not

33

1   "the product of a rational intellect and a free will." *Medeiros v. Shimoda*, 889 F.2d 819,

2   823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)); *see also*

3   *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). A "necessary predicate" to finding a

4   confession involuntary is that it was produced through "coercive police activity."

5   *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Coercive police activity can be the

6   result of either "physical intimidation or psychological pressure." *Townsend*, 372 U.S. at

7   307, *overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1 (1992); *see*

8   *also Blackburn*, 361 U.S. at 206 ("[C]oercion can be mental as well as physical, and . . .

9   the blood of the accused is not the only hallmark of an unconstitutional inquisition."). In

10  determining whether a confession is involuntary, courts are to look at the "totality of the

11  circumstances." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). Factors to be

12  considered include the degree of police coercion; the length, location and continuity of

13  the interrogation; the defendant's maturity, education, physical condition, mental health,

14  and age; and whether the police officers informed the defendant of his rights to remain

15  silent and to have counsel present. *See id.* at 693-94; *Yarborough v. Alvarado*, 541 U.S.

16  652, 668 (2004).

17        In light of the Court's ruling with respect to Claim 4, finding the existence of

18  implied bias as a result of the trial judge's relationship with the murder victim (*see supra*

19  Part IV.A), the Court would rule that Echavarria has satisfied the standard of 28 U.S.C.

20  § 2254(d) with respect to Claim 3. It was objectively unreasonable for the Nevada

21  Supreme Court to defer to the factual findings of a trial judge with an unconstitutional

22  implied bias. Therefore, if the Court were to proceed to rule on Claim 3, its review would

23  be *de novo*.

24        However, as the Court grants relief on Claim 4, and requires the State to provide

25  Echavarria a retrial, the Court will deny Claim 3, without prejudice, as moot.

26        The Court takes this approach with respect to Claim 3 — refraining from

27  embarking on *de novo* consideration of the question whether Echavarria's Juarez

28  confession was voluntarily given — out of sensitivity to the interests of comity and

1    federalism, and also considering the interest of judicial economy. While Claim 3 has

2    been exhausted, this Court expects that the issue of the admissibility of Echavarria's

3    Juarez confession may be revisited in state court, before Echavarria's retrial, in light of

4    this Court's ruling that the trial judge, who previously ruled upon the admissibility of the

5    Juarez confession, had an unconstitutional implied bias. Under these circumstances,

6    the Court will abstain from ruling on Claim 3, and will, instead, deny the claim, without

7    prejudice, as moot. *See Rose v. Lundy*, 455 U.S. 509, 518-22 (1982) (holding that, as a

8    matter of comity, federal court should not address merits of habeas petition unless

9    petitioner first has sought state judicial review of every ground presented); *see also*

10   *Sherwood v. Tomkins*, 716 F.2d 632, 634 (9th Cir. 1983) (noting that interests of comity

11   and judicial economy are particularly important in the habeas context where state

12   proceedings may render federal issue moot).[6]

13       **C.    Claim 2**

14       In Claim 2, Echavarria claims that his constitutional rights were denied because

15   the aggravating factors, upon which his death penalty was based, were invalid. Second

16   Amended Petition (dkt. no. 136), at 53-58. Specifically, Echavarria claims:

17       The [state] district court found that the two aggravators of burglary and
         robbery violated *McConnell* [*v. State*, 120 Nev. 1043, 102 P.3d 606
18       (2004)] and struck them. Mr. Echavarria is therefore actually innocent of
         the death penalty because the one remaining aggravator, murder
19       committed to avoid or prevent a lawful arrest or to effect an escape from
         custody, should have also been vacated by the district court."
20

21   *Id.* at 54 (citing Petitioner's Exh. 425 (dkt. no. 137-2)).

22       Echavarria argues that "the use of the murder during the course of an escape or

23   to avoid lawful arrest aggravator, NRS § 200.033(5), did not accomplish the required

24   narrowing demanded by the Eighth Amendment." *Id.* at 57; *see also id.* at 54. This is so,

25   Echavarria argues, because, to prove first degree murder, the prosecution relied, in

26   _____

27       [6]Echavarria requests an evidentiary hearing with regard to Claim 3. *See* Motion
     for Evidentiary Hearing (dkt. no. 191), at 2-4. Because the Court abstains from *de novo*
28   review of the claim, the Court will deny Echavarria's motion for an evidentiary hearing
     with respect to this claim, without prejudice.

1   part, upon NRS § 200.030(1)(c), which makes first degree murder a murder

2   "[c]ommitted to avoid or prevent the lawful arrest of any person by a peace officer or to

3   effect the escape of any person from legal custody." *See id.* at 54-57; *see also* NRS

4   § 200.030(1)(c). As the Court understands Echavarria's argument, it is that, because of

5   the similarity between the species of first degree murder defined at NRS § 200.030(1)(c)

6   and the aggravating circumstance defined at NRS § 200.033(5), the aggravating

7   circumstance does not accomplish the narrowing required by the Eighth Amendment.

8   *See* Second Amended Petition at 57.

9         Echavarria raised this claim in his second state habeas action, and the Nevada

10  Supreme Court denied the claim on its merits, ruling as follows:

11        One theory that the State pursued for first-degree murder was that
    Echavarria murdered Agent Bailey to prevent a lawful arrest or effectuate
12  an escape. He argues that, as a result, the preventing-a-lawful-arrest
    aggravator based on the same conduct is invalid under *McConnell*
13  because it fails to genuinely narrow the class of defendants eligible for the
    death penalty. However, this court rejected a similar challenge in *Blake v.*
14  *State*, 121 Nev. 779, 794, 121 P.3d 567, 577 (2005). Therefore, the district
    court did not err by denying this claim.
15

16  Order of Affirmance, Exh. 6 to Motion to Vacate Stay and Reopen Capital Habeas

17  Corpus Proceeding (dkt. no. 132-5 at 38-57), at 15 n.5.

18        In *Blake*, the Nevada Supreme Court ruled as follows on a similar challenge to

19  the preventing-a-lawful-arrest aggravator:

20        Blake also relies on this court's decision in *McConnell v. State*, in which
    we stated:
21

22              We conclude that although the felony aggravator of
    NRS 200.033(4) can theoretically eliminate death eligibility in
23  a few cases of felony murder, the practical effect is so slight
    that the felony aggravator fails to genuinely narrow the death
    eligibility of felony murderers and reasonably justify imposing
24  death on all defendants to whom it applies.

25  [Footnote: 120 Nev. 1043, ——, 102 P.3d 606, 624 (2004).]

26        Blake suggests that in his case, like *McConnell*, the theoretical
    application of the preventing-a-lawful-arrest aggravating circumstance
27  may constitutionally narrow the class of persons eligible for the death
    penalty but that the practical effect is so slight as to render the aggravator
28  unconstitutional. He asserts that virtually every murder case involves

1
2
3

some antecedent crime that provides a motive to avoid or prevent an arrest for that crime by murdering the victim. Therefore, Blake argues that although theoretically a case could be envisioned where such preliminary crimes do not exist, such crimes virtually always exist as a practical matter.

4
5
6
7
8

Blake's reliance on *McConnell* is unpersuasive. The concerns expressed by this court in *McConnell* are not present in Blake's case. In *McConnell*, this court had to determine, in cases where a first-degree murder conviction is based on felony murder, whether the State may also allege the felony murder's predicate felony as an aggravator. [Footnote: *Id.* at ___, 102 P.3d at 620-24.] We concluded that dual use of the felony in this way was constitutionally impermissible. [Footnote: *Id.* at ___, 102 P.3d at 624.] Here, the possible antecedent crime that Blake speaks of does not involve any such dual use.

9
10
11

We decline Blake's invitation to depart from our prior holdings on this issue. Strong evidence supported the submission of the preventing-a-lawful-arrest aggravating circumstance to the jury and the jury's finding of the aggravator. Therefore, we deny relief on this basis.

12

*Blake v. State*, 121 Nev. 779, 794-95, 121 P.3d 567, 577 (2005).

13

In light of *Lowenfield v. Phelps*, 484 U.S. 231 (1988), and *Zant v. Stephens*, 462

14

U.S. 862, 877 (1983), the Nevada Supreme Court's denial of Echavarria's claim was not

15

objectively unreasonable. "To pass constitutional muster, a capital sentencing scheme

16

must 'genuinely narrow the class of persons eligible for the death penalty and must

17

reasonably justify the imposition of a more severe sentence on the defendant compared

18

to others found guilty of murder.'" *Lowenfield*, 484 U.S. at 244 (quoting *Zant*, 462 U.S. at

19

877). The *Lowenfield* Court stated:

20
21
22

The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

23

*Id.* at 244-45. In this case, the jury's finding of the preventing-a-lawful-arrest aggravator

24

placed Echavarria in a narrowed class of first degree murderers and made him eligible

25

for the death penalty, consistent with the requirements of *Lowenfield* and *Zant*. That is

26

so regardless of the possibility that Echavarria was found guilty of first degree murder

27

because he committed murder "to avoid or prevent the lawful arrest of any person by a

28

peace officer or to effect the escape of any person from legal custody." *See* Second

1   Amended Petition at 54-57; *see also* NRS § 200.030(1)(c). Echavarria does not show

2   the application of the preventing-a-lawful-arrest aggravator in this case to amount to an

3   unreasonable application of any United States Supreme Court precedent.

4           Echavarria argues, in the alternative, that the Nevada Supreme Court's

5   *McConnell* holding "establishes a state-created liberty interest in preventing the

6   duplicative use of the felony-murder theory which is enforceable under the due process

7   clause of the Fourteenth Amendment," and "[t]he violation of that rule in [his] case was

8   therefore a violation of the federal constitutional guarantee of due process as well."

9   Second Amended Petition at 54. This argument is without merit. *McConnell* did not

10  concern the preventing-a-lawful-arrest aggravator defined in NRS § 200.033(5);

11  *McConnell* concerned the felony-murder aggravator defined in NRS § 200.033(4).

12  Furthermore, in *Blake*, the Nevada Supreme Court confirmed that the rule of *McConnell*

13  does not apply to the NRS § 200.033(5) preventing-a-lawful-arrest aggravator. *See*

14  *Blake*, 121 Nev. at 794-95, 121 P.3d at 577. The state-law holdings in *McConnell* and

15  *Blake* do not establish a liberty interest on the part of Echavarria that would foreclose

16  application of the preventing-a-lawful-arrest aggravator in his case.

17          Finally, with respect to Claim 2, Echavarria argues that after the Nevada

18  Supreme Court invalidated two of the three aggravating circumstances found by the

19  jury, leaving only the preventing-a-lawful-arrest aggravator, that court contravened

20  United States Supreme Court precedent, in reweighing the remaining aggravating

21  circumstance and the mitigating evidence, by failing to consider new mitigating evidence

22  presented for the first time in the state post-conviction proceedings. *See* Second

23  Amended Petition at 57-58; *see also* Order of Affirmance, Exh. 6 to Motion to Vacate

24  Stay and Reopen Capital Habeas Corpus Proceeding (dkt. no. 132-5 at 38-57), at 14-17

25  (Nevada Supreme Court's reweighing analysis). However, Echavarria has not shown

26  any United States Supreme Court precedent to require as much. *See Clemons v.*

27  *Mississippi*, 494 U.S. 738, 741, 745 (1990) ("[T]he Federal Constitution does not

28  prevent a state appellate court from upholding a death sentence that is based in part on

38

1   an invalid or improperly defined aggravating circumstance either by reweighing of the

2   aggravating and mitigating evidence or by harmless-error review."); *see also Richmond*

3   *v. Lewis*, 506 U.S. 40, 48-49 (1992); *Stringer v. Black*, 503 U.S. 222, 232 (1992). The

4   Nevada Supreme Court's reweighing of the remaining aggravating circumstance against

5   the mitigating evidence presented at trial was not an objectively unreasonable

6   application of United States Supreme Court precedent.

7       The state court's denial of the claims in Claim 2 was not an unreasonable

8   application of clearly established federal law, as determined by the Supreme Court, and

9   it was not based on an unreasonable determination of the facts in light of the evidence

10  presented in state court. *See* 28 U.S.C. § 2254(d). The Court denies Echavarria habeas

11  corpus relief with respect to Claim 2.

12      **D.   Claim 7**

13      In Claim 7, Echavarria claims that his constitutional rights were denied because a

14  jury instruction given in the guilt phase of his trial "relieved the State of its burden of

15  proof as to all the elements of first degree murder." Second Amended Petition at 86. In

16  this claim, Echavarria puts at issue the so-called "*Kazalyn* instruction," a jury instruction

17  used in Nevada murder cases before 2000. The instruction was approved in 1992 by

18  the Nevada Supreme Court in *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992), and

19  was disapproved by the same court eight years later in *Byford v. State*, 116 Nev. 215,

20  994 P.2d 700 (2000).

21      The *Kazalyn* instruction, as given in Echavarria's trial, stated:

22          Premeditation is a design, a determination to kill, distinctly formed
23      in the mind at any moment before or at the time of the killing.

24          Premeditation need not be for a day, an hour or even a minute. It
        may be as instantaneous as successive thoughts of the mind. For if the
25      jury believes from the evidence that the act constituting the killing has
        been preceded by and has been the result of premeditation, no matter
26      how rapidly the premeditation is followed by the act constituting the killing,
        it is willful, deliberate and premeditated murder.

27          The word "willful," as used in this instruction, means intentional.

28  ///

39

Exh. 69, Instruction No. 8. Echavarria contends this instruction was unconstitutional because it, in effect, collapsed into one the three separate elements of "premeditated," "willful," and "deliberate," thereby eliminating from the jury's consideration the elements "willful" and "deliberate." *See* Reply at 33-34.

Echavarria raised this claim in his second state habeas action, and on the appeal in that action the Nevada Supreme Court ruled as follows:

> Relying on *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000), and the Ninth Circuit's decision in *Polk v. Sandoval*, 503 F.3d 903 (9th Cir.2007), Echavarria contends that the district court erred by denying his claim that the premeditation instruction given, commonly known as the *Kazalyn* instruction, unconstitutionally conflated the concepts of deliberation and premeditation. *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992). Six years after Echavarria's direct appeal was resolved, this court decided *Byford*, which disapproved of the *Kazalyn* instruction on the mens rea required for a first-degree murder conviction based on willful, deliberate, and premeditated murder, and provided the district courts with new instructions to use in the future. *Byford*, 116 Nev. at 233-37, 994 P.2d at 712-15. This court recently held that *Byford* effected a change in Nevada law and does not apply to cases that were final when it was decided. *Nika v. State*, 124 Nev. 1272, 1287, 198 P.3d 839, 850 (2008), *cert. denied*, ___ U.S. ___, 130 S.Ct. 414 (2009). Because Echavarria's conviction was final when *Byford* was decided, *see Colwell v. State*, 118 Nev. 807, 820, 59 P.3d 463, 472 (2002), neither *Byford* nor *Polk* provides Echavarria relief.

> Echavarria acknowledges *Nika* but argues that its reasoning is flawed because it ignores the constitutional vagueness concerns attendant to the *Kazalyn* instruction and failed to determine whether *Byford* should apply retroactively as a substantive rule of criminal law. We conclude that neither argument warrants relief. Until *Byford*, this court consistently upheld the *Kazalyn* instruction and rejected constitutional challenges similar to Echavarria's. *Byford* did not alter the law in effect when Echavarria's conviction became final; rather, it changed the law prospectively. And because that change concerned a matter of state law, the *Byford* decision did not implicate federal constitutional concerns, triggering retroactivity scrutiny.

> Because *Byford* does not apply to Echavarria, we conclude that the district court did not err by denying this claim.

Order of Affirmance, Exh. 6 to Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding (dkt. no. 132-5 at 38-57), at 13-14.

Echavarria relies on *In re Winship*, 397 U.S. 358 (2007), and *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007), as support for his claim. *In re Winship* stands for the basic proposition that a defendant's federal constitutional right to due process of law requires

40

1    the prosecution to prove every element of an offense beyond a reasonable doubt. *In re*

2    *Winship*, 397 U.S. at 364. In *Polk*, the Ninth Circuit Court of Appeals held that the

3    *Kazalyn* instruction violated the defendant's federal constitutional right to due process of

4    law because it relieved the State of its burden of proving every element of the crime of

5    first degree murder. *Polk*, 503 F.3d at 909.

6          Echavarria's claim, however, is without merit, and the Nevada Supreme Court's

7    ruling was objectively reasonable. Echavarria's theory — that the *Kazalyn* instruction

8    unconstitutionally conflated the elements of first degree murder — has been

9    undermined by rulings of both the Nevada Supreme Court and the Ninth Circuit Court of

10    Appeals. *See Nika v. State*, 124 Nev. 1272, 198 P.3d 839, 859 (2008), *cert. denied*, 558

11    U.S. 955 (2009); *Babb v. Lozowsky*, 719 F.3d 1019, 1027-28 (9th Cir. 2013) *cert.*

12    *denied sub nom. Babb v. Gentry*, 134 S. Ct. 526 (2013), *overruled on other grounds by*

13    *Moore v. Helling*, 763 F.3d 1011 (9th Cir. 2014).

14          In *Babb*, the Ninth Circuit Court of Appeals explained the Nevada Supreme

15    Court's holding in *Nika*, and ruled as follows:

16          Subsequently, however, the Nevada Supreme Court held in *Nika v.*
17    *State*, 124 Nev. 1272, 198 P.3d 839, 849 (2008), that the *Byford* decision
    was not a clarification of the murder statute — that is, *Byford* had not
    righted prior decisions' incorrect interpretations of Nevada's murder
18        statute. Rather, the *Nika* court explained, *Byford* had announced a new
    interpretation of the murder statute, which changed the law. *Id*. The *Nika*
19        court declared that any language in *Byford* and [*Garner v. State*, 116 Nev.
    770, 6 P.3d 1013 (2000)] suggesting that *Byford* was a clarification rather
20        than a new rule was dicta. *Id*. at 849-50. According to *Nika*, this Court in
    *Polk* was wrong in concluding that the *Kazalyn* instruction was a violation
21        of due process because the instruction accurately represented the
    elements of first degree murder up until *Byford* was decided. Thus, *before*
22        *Byford was decided, the Kazalyn instruction did not improperly relieve the*
    *State of the burden of proving all the elements of first degree murder. Id*.
23        at 850.

24    *Babb*, 719 F.3d at 1027-28 (emphasis added). In *Babb*, then, the Court of Appeals held

25    that, in light of an intervening Nevada Supreme Court decision, its prior holding in *Polk*,

26    regarding the constitutionality of the *Kazalyn* instruction with respect to convictions that

27    became final before *Byford*, is no longer good law. *See id*. at 1027-28, 1030.

28    ///

Echavarria's conviction became final long before 2000, when *Byford* was decided. *See Echavarria v. Nevada*, 508 U.S. 914 (1993) (copy in record at Exh. 112) (after Nevada Supreme Court affirmed Echavarria's conviction and sentence, United States Supreme Court denied certiorari on May 17, 1993); *see also Colwell v. State*, 118 Nev. 807, 821, 59 P.3d 463, 473 (2002) (conviction is final when Supreme Court denies certiorari). After *Nika* and *Babb*, it is firmly established that the *Kazalyn* instruction properly reflected the elements of first degree murder in Nevada before the ruling in *Byford* in 2000. Echavarria has no viable argument that the use of the *Kazalyn* instruction violated his constitutional rights. The Nevada Supreme Court did not misapply the rule of *In re Winship*.

The Nevada Supreme Court's denial of the claim in Claim 7 was not an unreasonable application of clearly established federal law, as determined by the Supreme Court, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d). The Court will, therefore, deny Echavarria habeas corpus relief with respect to Claim 7.

### E.    Claim 9

In Claim 9, Echavarria claims that his constitutional rights were denied "because the trial court denied trial counsel the opportunity to investigate allegations of juror misconduct . . . ." Second Amended Petition at 97.[7] Echavarria also includes in this claim the following three specific allegations of juror misconduct: (1) a juror denied during jury selection that he had ever been the victim of a crime, but had been beaten up by four people with pipes and tire irons, and during deliberations he spoke to the other jurors about that experience, *see id.* at 103-04; (2) a juror went to a library before trial and researched the definition of murder, and then at home researched the definition of murder in a Catholic Encyclopedia, and during deliberations commented to other

---

[7]Claim 9 includes claims of ineffective assistance of counsel. *See* Second Amended Petition at 97, 106. However, the claims of ineffective assistance of counsel in Claim 9 have been dismissed. *See* Order entered March 20, 2013 (dkt. no. 174).

jurors about his research, *see id.* at 105; and (3) in the penalty phase of the trial, during jury deliberations, there was discussion of the fact that there would be appeals, *see id.* at 98-104.

On his direct appeal, Echavarria asserted his claim that the state district court violated his constitutional rights by depriving him of the opportunity to investigate allegations of juror misconduct. *See* Appellant's Opening Brief, Exh. 101, at 85-90. The Nevada Supreme Court denied that claim without discussion. *See Echavarria*, 108 Nev. at 749, 839 P.2d at 599 ("We have carefully examined appellants' numerous other assignments of error and determine that they lack merit.").

The clearly established federal law governing this claim, as set forth in Supreme Court precedent, is represented by *Remmer v. United States*, 347 U.S. 227 (1954), and *Smith v. Phillips*, 455 U.S. 209 (1982). The Ninth Circuit Court of Appeals has summarized that law as follows:

> A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances. *See* 28 U.S.C. § 2254(d)(3) (1994); *Remmer v. United States*, 350 U.S. 377, 379, 76 S.Ct. 425, 100 L.Ed. 435 (1956); *Remmer v. United States*, 347 U.S. 227, 230, 74 S.Ct. 450, 98 L.Ed. 654 (1954). An informal in camera hearing may be adequate for this purpose; due process requires only that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality. *See Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *United States v. Boylan*, 898 F.2d 230, 258 (1st Cir.1990).

*Dyer v. Calderon*, 151 F.3d 970, 974-75 (9th Cir. 1998); *see also Hedlund v. Ryan*, 750 F.3d 793, 806 (9th Cir. 2014).

On April 14, 1991, the day after Echavarria's trial concluded, Juror Ardys Pool approached Echavarria's counsel and informed them of events that, in counsel's view, constituted juror misconduct. Echavarria's counsel, with an investigator, then conducted a tape recorded interview of Juror Pool, and the recording of that interview was transcribed. *See* Transcript of May 1, 1991, Hearing, Exh. 75, at 2; Petitioner's Exh. 319 (transcript of interview). On April 19, 1991, Echavarria filed a motion for new trial, alleging juror misconduct. Exh. 73. The trial court held a hearing regarding the new trial

43

1   motion on May 1, 1991. *See* Transcript of May 1, 1991, Hearing, Exh. 75. At that

2   hearing, the trial judge expressed concern about the manner in which Echavarria's

3   counsel had acquired the information from Pool, and the manner in which counsel

4   brought it to the court's attention. *Id.* at 2-13. The trial judge ordered defense counsel to

5   have no further contact with the jurors until the court could conduct an evidentiary

6   hearing and determine whether juror misconduct had occurred. *See id.* at 7-8. The trial

7   judge stated that he would file a complaint with the proper authorities regarding defense

8   counsel's contacts with Pool. *Id.* at 10. Gurry's counsel suggested the judge should

9   consider recusing himself for purposes of the evidentiary hearing. *Id.* at 12.

10      The trial court held a further hearing regarding the matter on May 6, 1991. *See*

11   Transcript of May 6, 1991, Hearing, Exh. 76. At that hearing, the trial judge stated that

12   he would recuse himself from the evidentiary hearing regarding the alleged juror

13   misconduct. *Id.* at 2-3, 8; *see also* Petitioner's Exh. 316 (Gurry's motion to disqualify

14   Judge Lehman from presiding over the evidentiary hearing). The trial judge informed

15   counsel that he had called Juror Pool and instructed her to have no further contact with

16   the attorneys. Transcript of May 6, 1991, Hearing, Exh. 76 at 4-5.

17      The evidentiary hearing was held May 10, 1991, before another judge, Judge

18   Myron Leavitt. Transcript of May 10, 1991, Evidentiary Hearing, Exh. 79. At the

19   evidentiary hearing, the defense called one witness, Juror Pool; the State called as

20   witnesses Juror Charles Ivy, Juror Keri Norris, Juror Thomas Edmund Stramat, and

21   Juror Terry Winter. *Id.* Following the evidentiary hearing, on May 13, 1991, Judge

22   Leavitt issued an order denying the motion for new trial. Exh. 81.

23      Echavarria makes much of the fact that on May 1, 1991, the trial judge ordered

24   defense counsel not to make further contact with the jurors, and that the trial judge

25   contacted Juror Pool and instructed her not to have any further contact with the

26   attorneys. Echavarria does not, however, cite any United States Supreme Court

27   precedent supporting his contention that those actions violated his federal constitutional

28   rights. Under *Smith* and *Remmer*, the federal constitutional guarantee of due process of

44

law requires only that the trial court "undertake an investigation of the relevant facts and circumstances," "that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality." *Dyer*, 151 F.3d at 974-75 (citing *Smith*, 455 U.S. at 217, and *Remmer*, 347 U.S. at 230). In light of the United States Supreme Court precedent, the Nevada Supreme Court's ruling — denying relief on Echavarria's claim that his federal constitutional rights were violated by the trial judge's limitation of his investigation of juror misconduct prior to the evidentiary hearing — was not objectively unreasonable.

Echavarria also raised, on his direct appeal, the three claims of juror misconduct that he includes in Claim 9. *See* Appellant's Opening Brief, Exh. 101, at 85-90. The Nevada Supreme Court ruled as follows with respect to those claims:

> Both appellants raise allegations of juror misconduct, although Gurry challenges only the jurors' conduct during the guilt phase of the trial, while Echavarria contends that misconduct occurred during both the guilt and penalty phases. These allegations were considered in connection with a motion for a new trial which was denied by the district court after an evidentiary hearing. [Footnote: The evidentiary hearing was conducted by Judge Leavitt after Judge Lehman voluntarily recused himself following a motion by Gurry to disqualify him.]

> The allegations of juror misconduct are primarily based upon the testimony of juror Ardys Pool, who contacted defense counsel after the trial concluded and disclosed the following purported instances of impropriety by certain jurors.

> Juror Charles Ivy, who served as foreman, failed to indicate on a written questionnaire or during voir dire that he had been the victim of a crime. At the evidentiary hearing on juror misconduct, Ivy admitted mentioning to some of the other jurors during a recess that he had been in a fight as a youth many years ago in which he was beaten by men with tire irons and hospitalized. Ivy indicated that he did not consider himself to be a victim of a crime, but instead considered the incident a fight.

> In *Lopez v. State*, 105 Nev. 68, 89, 769 P.2d 1276, 1290 (1989), we stated that when a juror fails to reveal potentially prejudicial information on voir dire, the relevant question is whether the juror is guilty of intentional concealment, the answer to which "must be left with the sound discretion of the trial court." As Ivy's testimony indicates that he did not view the 24-year-old incident as a criminal act, the district court was well within its discretion in determining that Ivy did not intentionally conceal information from the court.

> Juror Thomas Stramat, upon learning that he was a potential juror in a capital case, went to the public library and looked up the definition of

murder. He also examined a Catholic Encyclopedia which he kept in his home concerning murder and capital punishment. He recorded his finding and carried them with him throughout the trial and deliberations. He did not show his findings to the other jurors, although he did comment that his religion and his training allowed him to consider the death penalty if the court so instructed him.

We agree with the district court's determination that Stramat's actions were not inconsistent with his role as a juror. Stramat stated that his purpose in doing the research was to determine if he could, in accordance with his religious faith, serve as a juror in a capital case. Stramat also stated that he considered the instructions on the law given by the judge superior to his own research. Stramat's actions indicate that he took his responsibility as a juror seriously, and wanted to be certain that there would be no religious impediments to his ability to evaluate the evidence and reach a verdict in accordance with what the evidence and the law might dictate. Juror Stramat's actions were neither improper nor prejudicial.

Pool also alleged that some of the jurors were watching news reports of the trial. These allegations were denied at the evidentiary hearing, although one juror readily admitted that his wife was taping the news coverage of the trial, and that he had offered to make the tape available to other jurors after the trial concluded.

Generally, for this court to examine charges of prejudicial juror misconduct based on exposure to media coverage, there must be a showing that a member of the jury has been exposed to media communications and has been influenced by it. *Arndt v. State*, 93 Nev. 671, 675, 572 P.2d 538, 541 (1977). Here, there was no reliable evidence that jurors had watched or read any news accounts, or were aware of the contents of any such accounts or were in any way influenced by media reporting of the trial proceedings. Since there was no evidence that appellants were prejudiced by media reports, no basis exists for overturning the district court's refusal to grant a new trial based upon media exposure. *See Barker v. State*, 95 Nev. 309, 313, 594 P.2d 719, 721-22 (1979) (it is within the trial court's province to decide whether a defendant has been deprived of an impartial jury by juror misconduct).

Finally, Echavarria alleges that Pool revealed to defense counsel in a post-trial interview that she only voted for the death penalty because she thought the verdict would be overturned on appeal due to juror misconduct. At the evidentiary hearing, the court excluded Pool's statements regarding her reason for voting for the death penalty as violative of NRS 50.065(2), which prohibits consideration of affidavits or testimony of jurors concerning their mental processes or state of mind in reaching the verdict. *See Riebel v. State*, 106 Nev. 258, 263, 790 P.2d 1004, 1008 (1990). We agree that the district court properly excluded evidence of Pool's mentation in deciding upon a verdict.

*Echavarria*, 108 Nev. at 740-42, 839 P.2d at 593-94.

Criminal defendants have a constitutional right under the Sixth and Fourteenth Amendments to a trial by fair, impartial jurors. *Duncan v. Louisiana*, 391 U.S. 145, 148-

46

1   49 (1968); *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961). However, the Constitution "does

2   not require a new trial every time a juror has been placed in a potentially compromising

3   situation." *Smith v. Phillips*, 455 U.S. at 217.

4       With regard to the question of a juror failing to disclose information in voir dire, in

5   order to obtain a new trial based on juror nondisclosure of information during voir dire,

6   "a party must first demonstrate that a juror failed to answer honestly a material question

7   on voir dire, and then further show that a correct response would have provided a valid

8   basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464

9   U.S. 548, 556 (1984); *see also United States v. Edmond*, 43 F.3d 472, 473 (9th Cir.

10  1994). Here, in light of the evidence at the evidentiary hearing, the state court

11  determined that Juror Ivy did not intentionally conceal information during voir dire. Given

12  that the event at issue was some 25 years in the juror's past, when he was 19 years old,

13  and given his view of the event as a fight rather than a crime against him, the state

14  court's denial of Echavarria's claim was not objectively unreasonable. *See Edmond*, 43

15  F.3d at 473-74.

16      It is well established that "the jury should pass upon the case free from external

17  causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox v.*

18  *United States*, 146 U.S. 140, 149 (1892). However, a constitutional violation only occurs

19  if the extraneous information was such as to create actual bias on the part of the jurors.

20  *See Smith v. Phillips*, 455 U.S. at 216. In this case, in light of the evidence at the

21  evidentiary hearing, the state court reasonably determined that Juror Stramat's research

22  before trial — to determine whether he could, consistently with his religious faith, serve

23  as a juror — was not inconsistent with his role as a juror. Furthermore, the state court

24  reasonably found that Juror Stramat did not discuss with other jurors the information he

25  had found in his research.

26      Similarly, with respect to the allegation that during jury deliberations in the

27  penalty phase of the trial there was discussion of the fact that there would be appeals,

28  in light of the evidence at the evidentiary hearing, and in light of the state court's

1   evidentiary ruling that Juror Pool's testimony regarding the effect of the comments upon

2   her verdict was inadmissible, the Court finds that it was not objectively unreasonable for

3   the state court to determine that the alleged comments were not such as to bias the jury

4   against Echavarria. Moreover, on the appeal in Echavarria's second state habeas

5   action, in ruling on the question of cause and prejudice to overcome Echavarria's

6   procedural default, the Nevada Supreme Court reasonably ruled that Echavarria failed

7   to show any prejudice from post-conviction counsel's failure to raise the claim that the

8   jurors discussed the appellate process in deliberations in the penalty phase of his trial.

9   *See* Order of Affirmance, Exh. 6 to Motion to Vacate Stay and Reopen Capital Habeas

10  Corpus Proceeding (dkt. no. 132-5 at 38-57), at 11 ("Considering the factors in [*Meyer*

11  *v. State*, 119 Nev. 554, 80 P.2d 447 (2003)] used to assess prejudice, we conclude that

12  there is no reasonable probability that the foreman's improper comments affected the

13  sentencing decision.").

14          This Court has examined the transcript of the evidentiary hearing and concludes

15  that the state court's rulings on Echavarria's claims of juror misconduct were not an

16  unreasonable application of clearly established federal law, as determined by the

17  Supreme Court, and were not based on an unreasonable determination of the facts in

18  light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

19          The Court will, therefore, deny Echavarria habeas corpus relief with respect to

20  Claim 9.[8]

21  ///

22  ///

23  _____

24          [8]Echavarria requests an evidentiary hearing with regard to Claim 9. *See* Motion
    for Evidentiary Hearing (dkt. no. 191), at 4-5. As Echavarria does not make the showing
25  required by 28 U.S.C. § 2254(d) — that the state court's denial of the claim was
    contrary to, or an unreasonable application of, clearly established federal law, as
26  determined by the Supreme Court of the United States, or that the ruling was based on
    an unreasonable determination of the facts in light of the evidence presented in the
27  state court proceeding — the Court will deny Echavarria's motion for an evidentiary
    hearing with respect to this claim. Federal habeas review under 28 U.S.C. § 2254(d) is
28  limited to the record before the state court that adjudicated the claim. *Pinholster*, 131
    S. Ct. at 1398.

48

**F.     Claim 11**

In Claim 11, Echavarria claims that his constitutional rights were denied because of prosecutorial misconduct. Second Amended Petition at 112-13. Specifically, Echavarria claims that the prosecution committed misconduct in closing argument in both the guilt and penalty phases of his trial by arguing that he killed Agent Bailey to satisfy a "savage blood lust." *Id.* at 112.[9]

The prosecutor's argument in the guilt phase of the trial that is the subject of Echavarria's claim was as follows:

> . . . Mr. Echavarria claims he was in a panic, he just wanted out of there. Well, he had the agent on the floor, on his back, he'd won the struggle. The magazine was out of the [agent's] gun. He now had a gun in his hand and he was right next to the front door. He didn't want out, he wanted to satisfy what was in his mind at the time, he wanted to satisfy a savage blood lust, a desire to kill, a desire for revenge on the man who frightened him because he was going to take him to jail. That is why he didn't avail himself to the opportunity, when he had the drop on the agent, to go out the door. That is why he shot him. And that is certainly why he shot him a second time. And that is why he shot him a third time four to six seconds later. And that's premeditation. That is a willful, intentional, deliberate, premeditated killing and that's first degree murder.
>
> You will recall the testimony of William Kendall that he heard three shots, that he got up and ran and took cover before the second and third shot. But you recall his testimony that between, before the first shot and up to the second shot he saw Jose Echavarria, he saw him standing over John Bailey who was on the floor. He saw him holding his gun in two hands down at him. And he saw him fire it. That's not panic, that's the satisfaction of savage blood lust.

---

[9]Claim 11 also includes a *pro forma* claim that the State improperly failed to disclose some unspecified material, and *pro forma* claims of ineffective assistance of counsel. *See* Second Amended Petition at 113. Echavarria has provided no substantive argument regarding those claims. *See id.*; Reply at 57-58. The Court sees no indication in the record that such claims have been asserted in the Nevada Supreme Court. *See* Exh. 101 (Echavarria's opening brief on direct appeal); Exh. 127 (Echavarria's opening brief on appeal in first state habeas action); Exh. 1 to Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding (dkt. nos. 132-2, 132-3) (Echavarria's opening brief on appeal in second state habeas action). The Court generally cannot grant relief on a claim not exhausted in state court. *See* 28 U.S.C. § 2254(b). Moreover, any such claims of ineffective assistance of counsel are procedurally defaulted. *See* Exh. 6 to Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding, at 2-11 (dkt. no. 132-5 at 39-48) (Nevada Supreme Court's Order of Affirmance in second state habeas action, ruling claims of ineffective assistance of counsel to be procedurally barred).

MR. SCHIECK [defense counsel]: Object to the continued characterization, Your Honor, that's inflammatory language.

THE COURT: I'll sustain that. Avoid that kind of language Mr. Henry.

MR. SCHIECK: Will you instruct the jury on that also?

THE COURT: Disregard, jury.

Trial Transcript for April 3, 1991, Exh. 61, at 32-33. The prosecutor's argument in the penalty phase of the trial that is the subject of Echavarria's claim was as follows:

And so, he picked up his pistol and shot him not once, not twice, but three times. That tells you something about his character. I dare say that at the penalty phase of these proceedings — savage, blood lust is something you should consider.

MR. SCHIECK: Objection your Honor. That's inflammatory. I ask that it be stricken.

BY THE COURT: I'll tell the jury to disregard that.

Trial Transcript for April 10, 1991, Exh. 65, at 28-29. During the next break in the trial, the defense moved for a mistrial based on the prosecution's use of the phrase "savage blood lust." *Id.* at 62-64. The prosecutor stated, in response to that motion, that, as Echavarria's character was at issue in the penalty proceeding, he felt that the use of the phrase was proper there, despite the trial court's ruling regarding the use of the phrase in the guilt phase of the trial. *Id.* The trial court denied the motion for mistrial. *Id.*

Echavarria raised this claim of prosecutorial misconduct on his direct appeal. *See* Appellant's Opening Brief, Exh. 101, at 33-37. The Nevada Supreme Court ruled as follows:

We have also examined Echavarria's and Gurry's allegations of prosecutorial misconduct during the trial, and conclude that any misconduct which might have occurred was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also* NRS 178.598 ("[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded"); *Williams v. State*, 103 Nev. 106, 111, 734 P.2d 700, 703 (1987) (harmless prosecutorial misconduct does not justify reversal). The instances of alleged misconduct were minor and did not detract from the substantial body of evidence reflecting appellants' guilt. [Footnote: . . . . Echavarria complains that he was prejudiced by the prosecutor's use of the phrase "savage blood lust" in the penalty phase as a reason for killing Agent Bailey. The impact of the phrase over a four-week trial, especially

50

1        when the jury was instructed to disregard it, provides no basis for
2        concluding that Echavarria was deprived of a fair trial.]

3    *Echavarria*, 108 Nev. at 745, 839 P.2d at 597 (portion of footnote concerning argument

4    made only by Echavarria's co-defendant omitted).

5          It is clearly established federal law that a prosecutor's improper remarks violate

6    the Constitution only if they so infect the trial with unfairness as to make the resulting

7    conviction a denial of due process. *Parker v. Matthews*, ___ U.S. ___, 132 S. Ct. 2148,

8    2153, 183 L. Ed. 2d 32 (2012) (per curiam); *see also Darden v. Wainwright*, 477 U.S.

9    168, 181 (1986); *Comer v. Schriro*, 480 F.3d 960, 988 (9th Cir. 2007). The ultimate

10   question is whether the alleged misconduct rendered the petitioner's trial fundamentally

11   unfair. *Darden*, 477 U.S. at 183. In determining whether a prosecutor's argument

12   rendered a trial fundamentally unfair, a court must judge the remarks in the context of

13   the entire proceeding to determine whether the argument influenced the jury's decision.

14   *Boyde v. California*, 494 U.S. 370, 385 (1990); *Darden*, 477 U.S. at 179-82. In

15   considering the effect of improper prosecutorial argument, the court considers whether

16   the trial court instructed the jury that its decision is to be based solely upon the

17   evidence, whether the trial court instructed that counsel's remarks are not evidence,

18   whether the defense objected, whether the comments were "invited" by the defense,

19   and whether there was overwhelming evidence of guilt. *See Darden*, 477 U.S. at 182.

20   The *Darden* standard is general, leaving courts leeway in reaching outcomes in case-

21   by-case determinations. *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*,

22   541 U.S. 652, 664 (2004)). In a federal habeas corpus action, to grant habeas relief, the

23   court must conclude that the state court's rejection of the prosecutorial misconduct

24   claim was objectively unreasonable, that is, that it "was so lacking in justification that

25   there was an error well understood and comprehended in existing law beyond any

26   possibility for fairminded disagreement." *Id.* (quoting *Harrington*, 131 S. Ct. at 767-87).

27         In this case, Echavarria complains of a phrase used by the prosecution twice in

28   closing argument in the guilt phase of his trial, and once in closing argument in the

penalty phase of his trial. On both occasions, defense counsel objected, and the trial court sustained the objection and instructed the jury to disregard the offending comment. In light of the nature of the comments, and considering the weight of the evidence against Echavarria, the Court concludes that the prosecutorial misconduct complained of by Echavarria does not approach the standard for a constitutional violation.

The state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and that ruling was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court denies Echavarria habeas corpus relief with respect to Claim 11.

### G.    Claim 12

In Claim 12, Echavarria claims that his "death sentence is invalid because the anti-sympathy instruction given at the penalty phase violated his federal constitutional right to due process, equal protection, a reliable sentence, and effective assistance of counsel by unconstitutionally limiting the jury's ability to give effect to mitigating evidence." Second Amended Petition at 114.

In the penalty phase of Echavarria's trial, the trial court instructed the jury as follows, with a so-called "antisympathy" instruction:

> A verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with these rules of law.

Exh. 70, Instruction No. 25.

Echavarria argues:

> This instruction was constitutionally infirm because sympathy is a constitutionally relevant factor in determining punishment when it is based on evidence presented at the punishment hearing. The trial court, by negating the influence of sympathy on the verdict, denied trial counsel the opportunity to argue sympathy as a valid product of the evidence. The trial court's instruction also denied the jury the opportunity to give effect to evidence produced at the punishment hearing. The instruction denied the jury access to the vehicle, the weighing process, by which they express the sympathy produced by the evidence. Once the trial court instructed the

jury that "a verdict may not be influenced by sympathy," that valid constitutional factor produced by the evidence was unconstitutionally removed from the weighing process.

Second Amended Petition at 114.[10]

Echavarria raised this claim on his direct appeal. *See* Appellant's Opening Brief, Exh. 101, at 43-48. The Nevada Supreme Court denied the claim without any discussion of it. *See Echavarria*, 108 Nev. at 749, 839 P.2d at 599 ("We have carefully examined appellants' numerous other assignments of error and determine that they lack merit.").

In *Saffle v. Parks*, 494 U.S. 484 (1990), the United States Supreme Court held as follows:

> We also reject Parks' contention that the antisympathy instruction runs afoul of [*Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982)] because jurors who react sympathetically to mitigating evidence may interpret the instruction as barring them from considering that evidence altogether. This argument misapprehends the distinction between allowing the jury to consider mitigating evidence and guiding their consideration. It is no doubt constitutionally permissible, if not constitutionally required, *see Gregg v. Georgia*, 428 U.S. 153, 189-195, 96 S.Ct. 2909, 2932-2935, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.), for the State to insist that "the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." [*California v. Brown*, 479 U.S. 538, 545 (1987) (O'CONNOR, J., concurring)]. Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It would bevery difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our

---

[10]Claim 12 also includes a *pro forma* claim that the State improperly failed to disclose some unspecified material, and *pro forma* claims of ineffective assistance of counsel. *See* Second Amended Petition at 115. Echavarria has provided no substantive argument regarding those claims. *See id.*; Reply at 58-59. The Court sees no indication in the record that such claims have been asserted in the Nevada Supreme Court. *See* Exh. 101 (Echavarria's opening brief on direct appeal); Exh. 127 (Echavarria's opening brief on appeal in first state habeas action); Exh. 1 to Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding (dkt. nos. 132-2, 132-3) (Echavarria's opening brief on appeal in second state habeas action). The Court generally cannot grant relief on a claim not exhausted in state court. *See* 28 U.S.C. § 2254(b). Moreover, any such claims of ineffective assistance of counsel are procedurally defaulted. *See* Exh. 6 to Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding, at 2-11 (dkt. no. 132-5 at 39-48) (Nevada Supreme Court's Order of Affirmance in second state habeas action, ruling claims of ineffective assistance of counsel to be procedurally barred).

longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary. *See Gregg, supra*, 428 U.S., at 189-195, 96 S.Ct., at 2932-2935; *Proffitt v. Florida*, 428 U.S. 242, 252-253, 96 S.Ct. 2960, 2966-2967, 49 L.Ed.2d 913 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.); [*Jurek v. Texas*, 428 U.S. 262, 271-72 (1976) (same)]; *Woodson v. North Carolina*, 428 U.S. 280, 303-305, 96 S.Ct. 2978, 2990-2991, 49 L.Ed.2d 944 (1976) (plurality opinion); *Roberts v. Louisiana*, 428 U.S. 325, 333-335, 96 S.Ct. 3001, 3006-3007, 49 L.Ed.2d 974 (1976) (plurality opinion). At the very least, nothing in *Lockett* and *Eddings* prevents the State from attempting to ensure reliability and nonarbitrariness by requiring that the jury consider and give effect to the defendant's mitigating evidence in the form of a "reasoned moral response," *Brown*, 479 U.S., at 545, 107 S.Ct., at 841 (emphasis in original), rather than an emotional one. The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice. *See id.*, at 541-543, 107 S.Ct., at 839-840.

*Saffle*, 494 U.S. at 492-93; *see also Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (declining to grant certificate of appealability regarding the issue).

The Nevada Supreme Court's denial of relief on this claim was not contrary to, or an unreasonable application of, *Saffle*, or any other clearly established federal law, as determined by the Supreme Court of the United States.

The Court will deny Echavarria habeas corpus relief with respect to Claim 12.

**H.   Claim 15**

In Claim 15, Echavarria claims that his "conviction and death sentence are invalid under the [state and federal] constitutional guarantees of due process, equal protection, effective assistance of counsel, a fair tribunal, an impartial jury, and a reliable sentence due to the cumulative errors in the jury instructions, gross misconduct by government officials and witnesses, and the systematic deprivation of Mr. Echavarria's right to the effective assistance of counsel." Second Amended Petition at 133.[11]

---

[11]Claim 15 also includes a *pro forma* claim that the State improperly failed to disclose some unspecified material, and *pro forma* claims of ineffective assistance of counsel. *See* Second Amended Petition at 133-34. Echavarria has provided no substantive argument regarding those claims. *See id.*; Reply at 59-60. The Court sees no indication in the record that such claims have been asserted in the Nevada Supreme Court. *See* Exh. 101 (Echavarria's opening brief on direct appeal); Exh. 127 (Echavarria's opening brief on appeal in first state habeas action); Exh. 1 to Motion to Vacate Stay and Reopen Capital Habeas Corpus Proceeding (dkt. nos. 132-2, 132-3) (Echavarria's opening brief on appeal in second state habeas action). The Court generally cannot grant relief on a claim not exhausted in state court. *See* 28 U.S.C. §
*( fn. cont...)*

1   As is discussed above, the Court will grant Echavarria habeas corpus relief with

2   respect to Claim 4.  Beyond Claim 4, the Court finds no other constitutional error.

3   Therefore, Echavarria's claim of cumulative error in Claim 15 is of no effect, and the

4   Court will deny Echavarria habeas corpus relief with respect to Claim 15.

5   **V.    CERTIFICATE OF APPEALABILITY**

6   This is a final order, granting Echavarria habeas corpus relief on one claim

7   (Claim 4), and denying Echavarria habeas corpus relief on the remainder of his claims.

8   A certificate of appealability is not required for an appeal by "a State or its

9   representative." Fed. R. App. P. 22(b)(3).

10   In *Rios v. Garcia*, 390 F.3d 1082 (9th Cir. 2004), however, the Ninth Circuit Court

11   of Appeals held that a habeas petitioner, to whom the writ was granted, could not assert

12   on his cross-appeal a claim denied by the district court without a certificate of

13   appealability. *See Rios*, 390 F.3d at 1086-88. Therefore, under 28 U.S.C. § 2253(c),

14   Federal Rule of Appellate Procedure 22(b), and Rule 11(a) of the Rules Governing

15   Section 2254 Cases in the United States District Courts, the Court considers whether a

16   certificate of appealability should issue as to the claims on which the Court denies

17   Echavarria relief.

18   The standard for the issuance of a certificate of appealability requires a

19   "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The

20   Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

21   > Where a district court has rejected the constitutional claims on the
22   > merits, the showing required to satisfy § 2253(c) is straightforward: The
     > petitioner must demonstrate that reasonable jurists would find the district
23   > court's assessment of the constitutional claims debatable or wrong.

24

25   _____

(… fn. cont.)
26   2254(b).  Moreover, any such claims of ineffective assistance of counsel are
     procedurally defaulted. *See* Exh. 6 to Motion to Vacate Stay and Reopen Capital
27   Habeas Corpus Proceeding, at 2-11 (dkt. no. 132-5 at 39-48) (Nevada Supreme Court's
     Order of Affirmance in second state habeas action, ruling claims of ineffective
28   assistance of counsel to be procedurally barred).

1      *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074,

2      1077-79 (9th Cir. 2000).

3          The Court finds that, applying the standard articulated in *Slack*, a certificate of

4      appealability is not warranted with respect to the claims on which the Court denies

5      Echavarria relief. The Court, therefore, will deny Echavarria a certificate of appealability.

6  **VI.     CONCLUSION**

7          It is therefore ordered that the motion for evidentiary hearing (dkt. nos. 191, 192)

8      of the petitioner, Jose L. Echavarria, is denied.

9          It is further ordered that the second amended petition for writ of habeas corpus

10      (dkt. nos. 136, 139), of the petitioner, Jose L. Echavarria, is granted.

11          It is further ordered that the petitioner, Jose L. Echavarria, shall be released from

12      custody within sixty (60) days, unless the respondents file in this action, within that sixty-

13      day period, a written notice of election to retry Echavarria, and the State thereafter,

14      within one hundred eighty (180) days after the filing of that notice, commences jury

15      selection in the retrial. Either party may request from this Court reasonable modification

16      of the time limits set forth in this paragraph.

17          It is further ordered that the judgment in this action shall be stayed pending the

18      conclusion of any appellate or certiorari review in the Ninth Circuit Court of Appeals or

19      the United States Supreme Court, or the expiration of the time for seeking such

20      appellate or certiorari review, whichever occurs later.

21          It is further ordered that the petitioner, Jose L. Echavarria, is denied a certificate

22      of appealability with respect to the claims on which habeas corpus relief is denied.

23          It is further ordered that the Clerk of the Court shall enter judgment accordingly.

24      ///

25      ///

26      ///

27      ///

28      ///

1       It is further ordered that the Clerk of the Court shall provide a copy of this order,

2 and the judgment to be entered, to the Clerk of Nevada's Eighth Judicial District Court,

3 Clark County, Nevada, with reference to that court's case number C95399.

4       DATED THIS 16th day of January 2015.

5

6                             _____

7                             MIRANDA M. DU
                            UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28